(No. 26012.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PHILLIP COHEN *et al.* Plaintiffs in Error.

*Opinion filed April 15, 1941.*

POPPENHUSEN, JOHNSTON, THOMPSON & RAYMOND, (FLOYD E. THOMPSON, HENRY J. BRANDT, and DELOS DE JOHN, of counsel,) for plaintiffs in error.

GEORGE F. BARRETT, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and JULIUS L. SHERWIN, of counsel,) for the People.

Mr. JUSTICE SMITH delivered the opinion of the court:

Phillip Cohen, Jack Fox, Morris Ratner and Phillip Greenberg were indicted in the criminal court of Cook

county for the crime of burning to defraud. Cohen and Fox were granted a separate trial. They were found guilty by a jury and were sentenced to the penitentiary. The cause is here by writ of error.

Ratner and Greenberg were the principal witnesses for the People. After the term at which the judgment was entered had expired, plaintiffs in error filed a petition in the nature of a writ of error *coram nobis* alleging that Greenberg had repudiated his testimony and admitted he lied. The petition was supported by affidavits and prayed that the judgment be set aside and for a new trial. On motion of the People the petition was dismissed.

On this writ of error, plaintiffs in error seek to have reviewed the judgment of conviction entered against them by the criminal court and also the order of that court dismissing their petition or motion in the nature of a writ of error *coram nobis*.

It has long been settled in this State that the filing of a motion in the nature of a writ of error *coram nobis*, under section 89 of the Practice act of 1907, (sec. 72 of the Civil Practice act) is the commencement of a new suit, in which new issues are presented and upon which there must be a finding and a judgment. *Central Bond Co.* v. *Roeser*, 323 Ill. 90.

While such a motion is an appropriate remedy for the correction of certain errors in criminal cases, it is essentially a civil proceeding which may not be reviewed by this court on writ of error. It follows that we have no jurisdiction in this case to review the order of the criminal court dismissing the petition of plaintiffs in error in the nature of a writ of error *coram nobis*. Our jurisdiction is limited to a review of the judgment of conviction.

Among the grounds urged for reversal it is claimed the testimony of Ratner and Greenberg as accomplices was motivated by the hope of escaping punishment, that it is uncorroborated and is unworthy of belief.

Ratner was in the fruit business in the city of Chicago. He operated three stores. The fire upon which the indictment is based occurred in his Broadway store about 2:25 P. M. on Sunday, November 12, 1939. He was the lessee of the premises. A butcher occupied one side of the store. There was a mortgage of $1000 on Ratner's fixtures, and he was $650 in arrears in the rent. He carried $4000 insurance. He testified he had an office on the balcony of a similar store operated by Louis Kasower on North avenue. Cohen and Fox were, respectively, forty-three and thirty-nine years old. They were in charge of the offices on West Roosevelt Road of two associations of small tradesmen, the Independent Retail Jewish Grocers' Association and the Independent Delicatessen Association, of which Fox was manager. They published a monthly trade journal called *"Jewish Food Merchant."* Their connection with these enterprises dates back several years. They are both natives of Chicago, and knew Ratner for two and three years, respectively. Cohen is a high school graduate and attended Northwestern University for three years. As a boy he worked days and went to night school. After leaving the army he was assistant manager of the "Boston Store" until his health became impaired, after which he was a solicitor for a well-known life insurance company for two years, and was an electrical contractor until 1928, when, at the request of certain grocers, he organized the Chicago Retail Food and Fruit Stores. He lived at the Guyon Hotel. In 1938, Ratner, who was then president of Independent Fruit Dealers' Association, attempted to have his organization taken over by Cohen and Fox, whose organizations recognized union labor. He was advised to go along with the unions, but refused and his association was afterwards dissolved. He had trouble with the union and about his sales tax. There is no evidence that tends to support the People's insinuation that Cohen and Fox were racketeers or "muscle men" or associated

with any such characters, or that they represented any labor union against the interest of merchants.

Ratner testified that he saw a lawyer to whom Cohen and Fox sent him about his sales tax; that in October, 1939, he discharged one of his clerks and shortly thereafter plate glass windows were broken in his and his son's places of business; that on November 6, 1939, he called on Cohen and Fox and told them about the windows and that he was having trouble with the unions, asking them to find out its source and stop it; that he told them he had lost money in the Broadway store for fourteen months and the landlord would not cancel the lease; that Cohen told him all the trouble would be taken care of and not to worry, that he would get him out of the store in no time and suggested a fire would do it; that he told Cohen he had no experience with fires and Cohen replied that he (Ratner) would not have anything to do with it, but it would be done; that he saw Cohen and Fox the next day, November 7, at their office between 4:00 and 5:00 o'clock, and it was agreed he would pay them $1000 for having the place burned by parties from St. Louis; that there were girl secretaries where he came in, but not in the room where the conversation took place; that he went to their office again on the following day, November 8, at the same hour, and they told him not to worry about the windows, and they would be ready for the fire on Sunday; that Cohen said he and Fox would go to the store next day to check up on it, and that the fire would be set on the butcher's side so as to appear it originated from the butcher shop; that he saw them again the next day, November 9, and at Cohen's request he gave him the keys for duplication; that he and Cohen drove to a hardware store on Roosevelt Boulevard, the location of which he described, and that Cohen went into the store and came out in about ten minutes, saying he had ordered the keys and they would be ready the next day; that they then drove to a bakery on Madison street

where Cohen made a purchase, and later left the car at Austin Boulevard; that he again saw Cohen and Fox at their office on the next day, November 10, at 4:30 P. M., where he paid Cohen $250, agreeing to pay the balance on Saturday night, and that Cohen returned his keys; that he had sold the store on North avenue to the boys who formerly worked for him; that Cohen and Fox came to his office there at 7:00 o'clock Saturday night and he handed Cohen the balance; that as they left Fox took an apple; that the boys of the store had nothing to do with it and he rapped on his office window and said it was all right and to charge it to him, and that he went to the store Sunday morning at 11:00 o'clock, checked the register, let down the awning and went to the Medinah Club, returning to the store after the fire.

Ratner further testified that on the morning after the fire he telephoned Cohen at the Guyon Hotel and went there about 10:00 o'clock; that he told Cohen that his (Ratner's) son was at the police station and they wanted the witness to come down there; that at Cohen's suggestion they went to see Fox at his home, and that Fox told him to go to the station and say nothing and if they did not hear from him by noon they would get him out; and that Fox told him to say he did not know anything and had not seen them; that he was arrested that day and remained in custody two days until bond was furnished; that he saw Fox at the State's attorney's office, and told the officers, and testified before the grand jury, that Fox had nothing to do with the fire and that Cohen was the only man he dealt with. Two indictments were found. Fox was not named in the first one.

Greenberg was employed by a life insurance company. He testified that Cohen called him by telephone on November 10 and arranged to meet him at Handelman's restaurant at 5:30 or 6:00 o'clock that evening; that they met as agreed and Cohen told him he had a place he wanted

burned, naming Ratner's Broadway store; that Cohen said all he would need was a four or five-gallon jug of gasoline and forty or fifty pounds of paper, and that there was $1000 in the job; that he met Cohen the next morning at about 10:00 o'clock in the lobby of the Guyon Hotel, where they sat on a lounge fifteen or twenty minutes; that Cohen gave him the store keys, told him the job was to be done Sunday, and the witness would get his share when it was over; that he then left, collected some insurance and went to his sister's house, arriving about noon, where a celebration over his nephew's confirmation at a Jewish temple was in progress; that in the afternoon he engaged the help of his brother Al in the proposed fire, and on Sunday morning went to his brother's place where persons named Goldfarb and Dimschultz filled nine or ten sacks with crumpled paper; that he procured a five-gallon bottle of gasoline and a sprinkling can and drove back to his brother's place, where all the materials were loaded in Goldfarb's car; that all four of them drove to the Broadway store about 1:30 or 2:00 o'clock, where the materials were carried in and he set the fire after the others left, and that he discarded the keys in the alley; that upon learning by telephone the next day that his brother had been arrested, he left the office and stayed at certain named hotels under different assumed names, until he was arrested seven or eight days later. He testified he had not been promised immunity but did not expect to be punished. Ratner testified his attorney did not tell him something had gone wrong and he would not get probation.

Dimschultz, Goldfarb and Al Greenberg were arrested Sunday afternoon. Ratner's son was arrested the next morning and Ratner was taken into custody when he came to the police station. Cohen was in custody on November 13 and 14, and was discharged on the evening of November 14. He did not return to the Guyon Hotel and remained away until December 4, when he surrendered.

The police were unable to find him meanwhile. A part of the time he was at his mother's home in Chicago, later going to Wisconsin. He testified he did so because the police were hounding him and his wife, and his attorney advised him he had an arrangement with the State's attorney's office to surrender him whenever he was indicted. Such an arrangement is not disputed.

Louis Kasower bought the North avenue store from Ratner about a year previously. He testified that Cohen and Fox came into the store about 7:30 on the evening of November 11 and went up to Ratner's office; that his partner had left about 7:00 o'clock; that he had not talked to anybody about the case until he talked with a representative of the State's attorney's office on the morning he testified, and that all that was said was that he was asked his name and told he was "going on trial." He said Ratner brought him back and forth to the court house for two days.

Ben Lipman testified that at Ratner's request he tried to get Fox to persuade the bondsmen who signed the bonds of Ratner's son and son-in-law to sign Ratner's bond, and that Fox refused to have anything to do with it because Ratner had involved his partner in the case; that later, when the witness told Ratner he understood Fox had been indicted, and that Ratner now said Fox was connected with it, Ratner told him he was doing it at the direction of his lawyer and the State's attorney, and that when the witness told him that was not right, Ratner replied he was doing what his lawyer told him to do. Ratner denied the conversation.

Fox and Cohen testified that Ratner came to them on November 8 regarding the trouble about discharging a clerk and the broken windows. They denied his being there or meeting him at any other time in November, or having any conversation with him at any time about a fire, and each of them categorically denied all the testimony of Ratner, Greenberg and Kasower as to their alleged connection with

the crime, and denied talking with Ratner on the next day after the fire. Cohen testified he never saw Greenberg in his life until he saw him in court. Fox testified that while he was in custody on November 13 and 14 no charge was pending against him; that Sherwin, of the State's attorney's office, asked him to get bond for Ratner, told him to see Ben Lipman, and arrangements were made for Ratner's son to come to Cohen's office the next morning; and that when Lipman tried to make the bond, two police officers came into the hallway, and in response to their question: "What are you doing here?" the witness told them he was trying to make Ratner's bond.

The clerk and the bellboy of the Guyon Hotel testified Greenberg did not meet Cohen in the lobby on the morning of November 11, and that Cohen came down to the lobby and went out the front door about 9:30; that he handed the bellboy some clothes to be cleaned, departing immediately, and was not there during the remainder of the day. The bellboy produced a call ticket of the transaction about the clothes.

Louis Grant testified he knew Ratner for fifteen years and had some dealings with him; that about ten days before Christmas, Ratner asked him to do a favor for him by going to Ratner's lawyer and telling him he was present when Ratner paid two men some money; that he did not go, and later, Ratner again asked him to do it and he refused.

Handelman testified he knew Cohen and Greenberg for seventeen years; that neither of them was in his restaurant on the evening of November 11, and he had not seen Greenberg for six or seven weeks previously. Benjamin Drucker testified Cohen was in his barber shop from 6:00 to 8:30 o'clock on that evening.

Sam Kaplan and Jack Lavin testified Cohen was in the office of their sausage factory from 9:30 to 11:00 o'clock on the morning of November 13.

Stanley Stukner testified Cohen was in his office about an hour from 4:30 o'clock on the afternoon of November 10; that they went to Carl's restaurant and, after eating, went to a meeting at Cohen's office to form an association of beer distributors about 6:30 or 7:00 o'clock, and remained there until 11:30.

Fox testified he was sick at home on November 6 and 7 and did not go to the office. Dr. Morris Hershman testified he called on Cohen on November. 6 and found him in bed with a fever of 102 attributable to an acute cold.

A large number of witnesses testified to the good reputation of Cohen and Fox for honesty and integrity and as peaceful and law-abiding citizens.

A motion for new trial, before the judgment was entered, was supported by affidavits of the managers of the three hotels at which Greenberg testified he stayed after the fire, denying that he or anybody under the names he mentioned stayed there at any time during such period, and by affidavits of the Rabbi of the Synagogue where Greenberg's nephew was confirmed the morning of November 11, and a parishioner, that Greenberg was there from about 9:45 to 11:00 o'clock. This is the time Greenberg testified he was at the Guyon Hotel with Cohen. Other affidavits showed the affiants saw him at the synagogue about 11:00 o'clock.

Ratner denied asking Louis Grant to tell his lawyer he saw Ratner pay money to two men and denied knowing him. He admitted having had three previous fires at his places of business, all of which were insured, and collecting $1800 insurance in one instance. He equivocated in his testimony about Grant and about the previous fires.

Apparently reputable disinterested witnesses who were in nowise discredited testified: That Cohen was not in his office on November 6; that neither he nor Greenberg were in the Handelman restaurant on November 10; that Greenberg was not at the Guyon Hotel on November 11, but

was at the confirmation of his nephew; that Cohen and Fox did not meet Ratner on the morning of November 13; that Greenberg did not stay at any of the hotels at which he testified he was in hiding after the fire, and that Ratner attempted to get Grant to corroborate his story of paying Cohen and Fox.

The only testimony that the People claim corroborates the accomplice witnesses is that of Kasower. He did not mention the apple about which Ratner testified. In the light of Grant's testimony, Kasower's daily association with and close relation to Ratner, and his story that he never spoke to Ratner or anybody else about the case, although Ratner took him back and forth to court for two days, no credence can be given to Kasower's testimony. The State's attorney gave him an opportunity to say he had talked with him, but he persisted in the improbable story that he was only asked his name and told he was going on trial. The resultant situation is not only that the accomplice witnesses are uncorroborated, but the evidence strongly points to a subornation of perjury by Ratner. Greenberg is wholly uncorroborated as to any connection of Cohen or Fox with the crime. It is also to be noticed that Ratner told the State's attorney, and testified before the grand jury, that Fox had no connection with the fire. By his own testimoney he is a perjurer, and an experienced man in having fires of insured property, of which this is the fourth.

Significant facts are that the hardware man who is alleged to have duplicated the keys was not produced as a witness. No duplicate keys were offered in evidence and the People did not attempt to show any search for them where Greenberg testified he threw them away. None of the girl secretaries at the office of Cohen and Fox was produced to show Ratner was ever there in November except on the one occasion on November 8, when it is frankly admitted he was there. After testifying that he told Cohen and Fox his landlord would not cancel the lease, Ratner

further testified the landlord said he would get another tenant and let him out. According to his testimony, Cohen had the keys of his going business from late Thursday afternoon until Friday evening. Ratner had no other keys and the store must have been closed if Cohen had them. These facts greatly discredit Ratner. While Greenberg testified in chief that he had known Cohen five or six years, when Cohen testified he had never seen Greenberg before he came to court the People made no effort to corroborate Greenberg, or to have him testify how or where he became acquainted with Cohen. The People did not show whether Ratner knew the Greenbergs prior to the fire.

At the time of the trial Ratner and Greenberg had not been arraigned, and they afterward were granted probation. The falsity of their testimony and their motive in testifying for the prosecution in the expectation or hope of securing probation is clear. It is true that a conviction may be sustained upon the uncorroborated testimony of an accomplice. (*People* v. *Wagman,* 311 Ill. 330; *People* v. *Baskin,* 254 id. 509.) It is also true that we will not disturb a verdict of guilt where the evidence is in conflict if the People's evidence is sufficient to sustain the verdict, but we will not hesitate to reverse a judgment where the accomplice evidence lacks material corroboration or where it is discredited or appears to be actuated by a desire to avoid punishment. (*People* v. *Rendas,* 366 Ill. 385.) This is especially true where, as here, the defendants are shown to be respectable law-abiding citizens. (*People* v. *Vehon,* 340 Ill. 511; *People* v. *Harvey,* 321 id. 361.) The conviction in this case must stand or fall on the testimony of Ratner, Greenberg and Kasower. They are so thoroughly discredited, and their motives so apparent, that they are unworthy of belief. A conviction of reputable citizens upon such testimony would be a gross miscarriage of justice and cannot be allowed to stand. Because of this it is unnecessary to discuss the other grounds urged for re-

versal. Under the circumstances it would be an imposition upon the defendants to subject them to another trial and the ends of justice do not require it.

The judgment of the criminal court is reversed, without remandment.

*Judgment reversed.*