(No. 26480.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM A. BOTE *et al.* Plaintiffs in Error.

*Opinion filed January 22, 1942—Rehearing denied March 11, 1942.*

Gunn, Farthing, and Smith, JJ., dissenting.

Carl H. Preihs, Frank M. Ramey, and Hill & Van-
dever, for plaintiffs in error.

George F. Barrett, Attorney General, and Alan S.
Windels, State's Attorney, (J. D. Wilson, George A.
Hall, and Otto E. Funk, of counsel,) for the People.

Mr. Justice Wilson delivered the opinion of the court:

This is the second time this cause has been before this
court. The previous judgment of conviction of the de-
fendants, William A. Bote, Ray Linn and Edward Schaper,
of the crime of larceny was reversed because of errors in
the admission and exclusion of evidence and the cause
remanded to the circuit court of Montgomery county for
another trial. (*People* v. *Bote,* 376 Ill. 264.) A second
trial being had, the jury again found defendants guilty of
larceny, fixed the value of the property stolen at $13,399,
and judgment was rendered on the verdict. This writ of
error is sued out to reverse the judgment of conviction.

William J. Hoehn, a resident of Nokomis, visited defendant Bote's tavern in Nokomis about 5:00 o'clock in the afternoon of January 18, 1937. While there, he mentioned to defendants Bote and Linn the fact that he was going to Litchfield that night. After leaving the tavern Hoehn made another stop and arrived home about 6:30 P. M. Before he went to Litchfield the doors and windows of his house were all locked. His safe, under a desk, contained currency, securities and other valuables. Upon his return, between 10:00 and 11:00 o'clock in the morning of January 19, the door leading to the porch, and also the kitchen window above the cellar door, were open and the latch of the window broken. Scratches, presumably showing the route of travel of the safe while it was being removed, were observed on the floor around the desk, through the door and on to the porch. The safe, together with its contents, was stolen between the hours of 7:00 P. M. January 18, 1937, and 10:00 A. M. the next morning.

As upon the previous trial, the principal evidence for the People consisted of the testimony of Ben Wharton and James Cameron, an ex-convict, accomplices to the crime. Wharton pleaded guilty in the first trial and testified as to the details of the crime as a State's witness. After the jury was sworn to answer questions in the present trial and prior to their acceptance to try the issues counsel for the defendants made application to the court for an order on the State to produce the witnesses, Cameron and Wharton, so that they might be interrogated by the defendant's counsel. Thereupon the court recessed until 9:00 A. M. the following morning, and the defendant Wharton was called in chambers out of the presence of the jury for examination not under oath and thereupon the following took place. Wharton stated that on the previous trial he had perjured himself; that his conscience hurt him; that he had joined the church; that he was a "nervous wreck;" that he did not want to see three innocent men go to

prison; that before the last trial Sam Malone, a State investigator, threatened him with a rubber hose, took him to Joliet, where he was threatened and interrogated until late hours, was put across the hall at a desk, and in the morning questioned again; that he was "questioned all the way up there and all the way back;" that the version recounted on the last trial was the result of coaching by State's attorneys and Malone, and that "if the State wants me as a witness I am going to tell the truth." Examined by the court, Wharton stated, "It's the honest-to-God's truth, I will swear before God I don't know anything about it." Later, Wharton reversed himself under examination by attorneys for the People, and stated the testimony on the first trial was the truth; that the statement later introduced in evidence as defendants' exhibit "A" was made because Bote threatened him. Upon examination by the court, Wharton declared, "The statement I made [later] is the truth." Later, upon examination by the People he again stated his testimony on the original trial was the truth and the statement later offered in evidence was false, and was made because of fears for his life and threats. Again, on examination by counsel for the People, Wharton stated: "That makes four times I have changed my story. There was no warrant when I was put in jail in Hillsboro and Champaign. I was put in jail in Champaign for protection against them. I told sheriff Leo Gilliland I wanted protection, that I wanted him to put me some place where they couldn't get hold of me. That's the reason I went to Champaign. I was put in jail at Hillsboro, because my wife wanted me put in there because I was a nervous wreck and she couldn't stand me around."

On resumption of the trial the following morning Wharton was placed on the stand by the State, and, on direct examination, testified he knew the defendants and Cameron and that he saw the four of them on the afternoon of January 18, 1937, at Bote's tavern about 4:00 o'clock. The

witness then stated: "I perjured myself in the first trial through threats and promises." An objection to this statement was overruled by the court, whereupon the trial was suspended and Wharton was withdrawn for the time being, but directed to remain available. Later that afternoon, Wharton was again called as a People's witness, and testified, "I did not commit perjury on the former trial; I want to change the statement I made this morning." After several attempted answers were stricken, he again testified as to the happenings on the afternoon of January 18, 1937. According to Wharton he left the tavern at 5:00 o'clock, went home, returned at 6:00 o'clock, remaining until about 10:00 o'clock when he saw defendants and Cameron back of the partition. In answer to the question, "Was there a conversation there, at that particular time, between you Bote and Linn and Schaper and Cameron?" Wharton answered, "I will tell you one thing about it. I don't know anything about this case, I will say that." At this juncture, a colloquy between counsel for the People and the court ensued. Thereupon, the court announced he was going to make Wharton the court's witness, and directed the State's attorney to cross-examine. Then, Wharton, as a court witness and under cross-examination by the People, testified that he was sick from worry and had been ill for the past two months; that he had asked to be put in jail for protection; that he feared for his life and was afraid of Bote, "because they said they could have me knocked off for $10." Wharton further testified that his testimony on the previous trial that Bote had given all of them gloves, was "like every other testimony I gave; it was perjury;" and denied he or any of the defendants were at Hoehn's house January 18, 1937. In answer to the question, "Why do you say these things?" Wharton replied, "I tell you one thing. I was scared in the other trial. I was scared of Sam Malone, for one. I was taken to Joliet and questioned all night." The witness was then excused, and defendants' counsel

asked the court to instruct the jury to disregard the testimony of Wharton as a court's witness. The motion was denied.

On cross-examination, Wharton identified defendants' exhibit "A" as being an instrument signed by him. Wharton also testified that "this statement throughout speaks the truth, and the whole truth." The instrument, in narrative form, states he perjured himself on the former trial because of threats and promises of release on probation; that he had long worried about the matter, in particular, being the means of sending innocent persons to the penitentiary; that since the case was tried he had taken a different view of religion and goes to church, and that the statement was made of his own free will and accord. Wharton's testimony from then on was substantially the same as on the previous trial. From his testimony it appears the defendants and himself went to Bote's house to get the model "T" Ford truck; that Cameron then departed; that he, the witness, saw Linn at Bote's house standing by a tree; that he (Wharton) cranked the truck, and Linn and Bote got in the front seat and Schaper and Wharton in the back, Linn driving, and that they then went to Hoehn's house. Wharton further testified, "We took a tire tool and pried the window up, Linn and I, it was on the east side. The window was over a cellar door ´ * * * Linn and I went in the window and opened the door on the porch for Schaper and Bote. The door was on the porch * * *´ I opened the porch door. * * * Schaper and Bote came in. After all four were in the house we got the safe and loaded it. It was in the front room under a desk; we scooted it out, half carrying it, then backed the truck up and loaded it on the truck. * * * After we got the safe out and on the truck I left, because I didn't want to get mixed up in it. I went right.home, got there about twelve." Wharton further testified he next saw Bote at eight o'clock the next morning, "to see what I could get out of it. I mean

out of the safe." Wharton testified that the next morning they drove from Bote's tavern to the Casino tavern and from there to Hillsboro.

Cameron testified that he participated in a conference with defendants and Wharton in Bote's tavern about 5 :oo o'clock in the afternoon of January 18, 1937; that Bote said Bill Hoehn had a safe in his house and since he was going to Litchfield, that that night would be a good time to get it; that before closing-time a further conference among the five took place in the back of the tavern behind a partition; that Bote repeated what he had said in the previous conference, and gave all of them cotton gloves to eliminate possible finger prints; that he, Cameron, did not keep the gloves but put them on the table; that after the tavern was closed Wharton, Bote, Schaper and the witness were in the tavern and had another conference; that Linn did not participate in the third conference; that shortly thereafter Bote, Schaper, Wharton and the witness left the tavern through the back door, proceeded to Bote's house several blocks distant; that, upon arrival there, the witness told Wharton he was not going, assigning as a reason he was on parole, "didn't want to get into trouble," and that from there he (Cameron) went home. Cameron further testified that Bote, in the presence of Wharton, the other defendants and himself said that he would load the safe in his model "T" Ford. On cross-examination, Cameron testified that prior to the date of the crime he had been on parole, defendant Bote having been his parole sponsor. He added that on January 19, 1937, the morning after the crime, he met Bote, Schaper and Wharton at Bote's tavern and that they repaired to the Casino tavern west of Nokomis, where they delivered some beer, and while at the Casino met Virgil K. Adams, the owner of the Casino, and his wife.

The testimony of two night policemen of Nokomis was to the effect that while making their rounds during the

evening of January 18, 1937, they recognized defendants Schaper and Bote, and witnesses Cameron and Wharton, in Bote's tavern, and that at about 11:30 P. M., after closing-time, while they were making their usual routine check-up to see if all rear doors and windows were locked, they heard voices in the rear of the tavern, and recognized the voice of Bote, whom they knew. They were unable to identify the other voices heard.

Virgil K. Adams, a tavern owner of Nokomis, testified he was in Bote's tavern the afternoon of January 18, 1937, at about 5:00 o'clock, saw all three defendants there, together with Wharton and Cameron, and that the next morning at the Casino tavern he saw the defendants Bote and Schaper and, also, Wharton and Cameron.

None of the defendants testified as witnesses in their own behalf. To prove their innocence, defendants Bote and Schaper relied principally on alibis. No testimony whatever was introduced on behalf of defendant Linn. For Bote, his wife, her two nieces, Mary Hogan and Helen Kennedy, and Louis Gosnicker, testified. Mrs. Hogan, a resident of St. Louis, Missouri, arrived in Nokomis, January 17, 1937. The testimony of both nieces was to the effect that about 8:00 P. M., January 18, 1937, they attended a show in Nokomis, the performance lasting about two hours; that on their way home from the show they passed the Rose cafe and saw Bote behind the bar, with other men whom neither of them recognized; that they arrived home shortly after 10:00 o'clock and sat talking in the living room until Bote and his wife came home in their car. According to Mrs. Hogan, Bote arrived home about ten minutes after eleven, while Mrs. Kennedy thought it was about ten minutes later. Both, however, testified that after putting the car into the garage Bote and his wife came into the living room; that all four of them then talked about forty-five minutes to an hour, and that about midnight Bote went upstairs. Both nieces testified they

went to sleep shortly after Bote and his wife went upstairs, and that neither Bote nor his wife left the house during the night to their knowledge. Mrs. Bote testified that from the time she arrived home after eleven o'clock on the night in question, her husband did not at any time leave the house. Louis Gosnicker, an employee at the Rose cafe, testified he saw Bote leave the tavern at about 11:00 o'clock January 18, 1937. To impeach his testimony the People introduced in evidence a statement signed by Gosnicker prior to the first trial to the effect that Bote had remained in the tavern after the witness left. As to Schaper's alibi, Milo Johnson, a next-door neighbor, testified he saw a light burning in Schaper's window at 8:00 o'clock of the evening in question. He states he did not see Schaper there, observing that he could not see through the window on account of frost. The testimony of Schaper's mother was that she saw her son in bed asleep before she retired at 10:30 P. M., and that he did not thereafter come downstairs. On cross-examination, she testified, "If my son Ed Schaper was there when I went up he could have come down through the kitchen and come out without going through these rooms and my not knowing it."

Numerous residents in and around Nokomis, called by defendants to testify regarding Cameron's reputation for veracity, were practically unanimous in declaring it "bad."

Various garage and service station men and tavernkeepers in and around Nokomis testified Bote never had or used a model "T" Ford truck in his business. Gosnicker, part of whose testimony has been previously referred to, also testified that he had never seen a model "T" Ford truck used by Bote for delivery purposes. On the other hand, in a signed statement, Gosnicker stated Bote had shown him a Ford truck back of his garage and told him he was going to use it in delivering beer, and that he had "seen the truck standing back of his garage several times." In rebuttal, Roy Curry testified that his son, James, now

in Detroit, worked for Bote and drove to and from work in a model "T" Ford truck owned by the witness during the latter part of 1936 and the first part of January, 1937. Leo Curry, a son of Roy, also testified as to the father's ownership of the truck the latter part of December, 1936, and the first part of January, 1937, stating that his brother used the truck at Bote's place in Nokomis to haul beer. Martha Puddenz, a cousin of defendant Bote, told of passing by Hoehn's house between 6:30 and 6:45 o'clock in the evening of January 18, 1937, and seeing a truck parked along Hoehn's house; that the truck was larger than a model "T" truck; that she saw a man get out and walk to the side of Hoehn's house onto the walk leading into the house, and that although she did not recognize him, he was not Bote, Schaper or Linn, also, that he was not Hoehn, with whom she was acquainted.

The remaining evidence on behalf of defendants relates to statements purporting to have been made by James DePew, a resident of Vandalia, consisting of an affidavit, a series of questions and answers, and a statement in narrative form, introduced in evidence as defendants' exhibits "D," "E," and "F." Exhibit "D" consists of a series of questions asked DePew by counsel for defendants, in the latter's office, and exhibit "E" contains a resume of exhibit "D" in narrative form. Both instruments purport to have been signed by DePew, and the substance of their contents is that DePew knew of his own knowledge that none of the defendants committed the offense charged, but that DePew, Raymond Franks, two other men and two women planned the crime; that DePew, and the three other men had actually committed the offense, brought the safe to Franks' home, blew it open with nitroglycerine, cut it in pieces and hauled it to and dumped it in the Mississippi river, and that his share of the loot was $500. Exhibit "F" is in the form of an affidavit, allegedly signed by DePew at Pana, Illinois, March 6, 1940, before Claude Butts, a

notary public, and is to the effect that he knew of his own knowledge that the present defendants did not commit the offense of robbery of Hoehn's safe on January 18, 1937, and, on the contrary, that he knew of his own knowledge that Raymond Franks of Nokomis did commit the robbery. Dorothy Harris, stenographer, and Rose Bote, wife of defendant Bote testified to having seen DePew sign the exhibits. The notary public, Butts, was not called. DePew, upon being called as a witness for the People, denied signing the exhibits in question. He testified that he was about sixteen years old January 18, 1937; that in June, 1940, he was approached by defendants Bote and Linn at the Evans hotel in Vandalia where, in the presence of James A. Lawler, then chief of police of Vandalia, Bote offered him money to sign a statement that he and Raymond Franks took the safe from Hoehn's home; that Bote read something from a book purporting to be an Illinois statute book, saying that after three years they couldn't hurt DePew for it, and that he, DePew, told Bote he did not know anything about it. Lawler corroborated DePew's account of the conversation.

On rebuttal, the State produced Thomas A. McDevitt, sheriff of Effingham county, and Sam Malone, an investigator for the Bureau of Criminal Investigation and Identification at Springfield in 1939. Each denied any mention of a rubber hose in conversations with Wharton in attempts to get him to confess.

Defendants contend that the trial judge erred in making Ben Wharton a court witness and otherwise erred in permitting incompetent evidence to be introduced by the People. The court, having heard Wharton testify on the preliminary hearing and, later, on the trial knew of the evasive and contradictory statements he had made to the State's attorney and even to the court. Wharton had been indicted together with the present defendants, had pleaded guilty during a prior hearing to receiving stolen property,

had made a complete statement of his complicity in the crime, had testified for the People in a previous trial, and during the progress of the preliminary hearing and at the outset of the trial proper had shown unruly tendencies in testifying. In order to prevent a miscarriage of justice, the court was warranted in allowing the State's attorney to cross-examine him in regard to those statements. (*People v. Cardinelli,* 297 Ill. 116; *People* v. *Curran,* 286 id. 302.) Nor was the cross-examination of this witness by the People improper. When the court calls a witness he is not the witness of either the prosecution or the defense, under the rule which requires the party producing the witness to vouch for his credibility and prevents him from impeaching his own witness. Either party is permitted to cross-examine upon the issues involved in the case, and there is no rule which prohibits the impeachment of the witness by showing that he had previously made statements at variance with his testimony at the trial. (*People* v. *Rotello,* 339 Ill. 448.) Under the circumstances here present, Wharton had testified previously that he had been threatened and had asked for protection against defendant Bote and the latter's co-defendants, and it was not improper for the State's attorney to ask questions designed to learn whether he had been threatened, whether he had asked for protection, and whether certain persons came to his home and had conversations with him.

Errors in giving and refusing instructions on alibi are charged. Instruction No. 10, given at the request of the People, informed the jury that to render proof of an alibi a complete defense the evidence must cover the whole of the time of the commission of the crime so as to render the commission of the crime impossible or highly improbable. Instruction No. 1, given on behalf of defendants, states that if from all the evidence in the case, including the alibi, the jury entertains a reasonable doubt as to the guilt of the accused, it should by its verdict find the de-

fendants not guilty. Defendants' instruction No. 1 is not in contradiction of, but is supplementary to, People's instruction No. 10. Complaint is also made concerning the refusal of the court to give defendants' instruction No. 5. This instruction informed the jury that even if the alibi evidence did not cover the entire time, yet if it raised a reasonable doubt in the minds of the jury as to the guilt of the accused, its verdict should be not guilty. The purpose to be achieved in offering proof of an alibi is to show that defendants were elsewhere than at the scene of the crime at the time it was committed, thereby rendering their participation impossible or highly improbable, and when the evidence offered to establish an alibi, even though taken to be true, does not cover the entire period when the crime was alleged to have been perpetrated, it is not convincing. (*People* v. *Mitchell*, 368 Ill. 399; *People* v. *Schladweiler*, 315 id. 553.) In this case, People's instruction No. 10 contains all the requisite elements and in nowise limits the jury in its consideration of the evidence. It is not directed to the measure of proof, but defines what will amount to an alibi. The reasonable doubt as to the guilt of the defendants, arising out of the evidence of a defense of alibi must come from the fact that the evidence tends to show the impossibility or improbability of the presence of the defendants at the time of the commission of the crime. Here, there was no proof whatever offered as an alibi for the defendant Linn. The testimony of Rose Bote puts Linn in Nokomis the evening of the crime. The only testimony tending to prove an alibi for defendant Schaper was the testimony of his mother who said he was in bed about 10:30 o'clock. Her testimony further showed that the stairway from his bedroom led down through the kitchen, making it possible for him to leave the house and join the other defendants in committing the crime without her knowledge after the time she said she had seen him. No proof whatever is in the record showing his where-

abouts after 10:30 P. M. The testimony of Rose Bote and her two nieces was to the effect that Bote did not leave their house after returning about 11:00 o'clock. Cameron and Wharton testified as to the conspiracy to commit this crime, and Wharton further testified they went to Hoehn's residence and committed the larceny. This witness placed all three defendants in the house of William J. Hoehn, being corroborated by the night officers, Rogers and Johnson, as to defendants being in the tavern in the afternoon, in the evening about 8:30 o'clock and, again, at 10:30 P. M., and defendant Bote's voice was heard by the officers in the back of the tavern about 11:30 P. M. A reasonable doubt is not raised merely because the evidence is conflicting or because there is some evidence of an alibi. (*People* v. *Katsovitz,* 363 Ill. 187.) The jury was fully and fairly instructed as to the defense of alibi and burden of proof. The jury heard the evidence and by its verdict found all three of the defendants guilty. It is the special province of the jury, where the testimony cannot be reconciled, to determine the truth of the matter, and where there are circumstances tending to discredit the testimony tending to prove an alibi, the jury may find the defendants guilty.

People's instruction No. 2 told the jury that in order to sustain a conviction it is not necessary for the prosecution to prove the offense was in fact committed on the date alleged in the indictment, but that it is sufficient if it is proved beyond a reasonable doubt to have been committed within three years before the indictment was returned by the grand jury. This instruction has been upheld by this court even in cases where the proof conclusively showed the offense to have occurred on the same date as alleged in the indictment. (*People* v. *Daniels,* 317 Ill. 80; *People* v. *Davidson,* 240 id. 191.) Here, the question fairly arises as to whether the actual larceny took place before midnight on the 18th day of January, 1937, or after

midnight and on the morning of the 19th day of January, 1937. Police officer Rogers testified that when he went around to the rear of the tavern and heard Bote's voice therein the time was between 11 :00 and 11 :30 P. M. Night officer Johnson testified it was about 11 :30 P. M. when he heard voices in the back of the tavern and recognized Bote's voice. Defendants had to walk from Bote's tavern to Bote's house to obtain the truck, then drive the truck to Hoehn's house, jimmy the window in the house, drag out the safe and load it on the truck, all of which might have extended over until the next morning, which would have been the 19th day of January. From the circumstances, it appears the actual larceny of the safe may have been committed either on January 18, 1937, or on January 19, 1937, and this fact, if for no other reason, would justify the giving of the challenged instruction. We find no error committed in giving instruction No. 2 nor any other instruction with respect to which complaint is made. Thirteen instructions were given for defendants and eleven instructions given on behalf of the People, and when all the instructions are taken as a series and considered together the jury was fairly instructed as to the law of the case.

Finally, defendants insist that the evidence is insufficient to prove the guilt of the accused or any one or more of them beyond a reasonable doubt. They argue that the principal witnesses for the People as to the actual commission of the crime, namely, Cameron and Wharton, are accomplices, and that their testimony stands uncorroborated in the record as to material points. In particular, defendants urge that the accomplice evidence lacks material corroboration, is discredited, and appears to be actuated by a desire to avoid punishment. *People* v. *Cohen*, 376 Ill. 382, and the other authorities relied upon by defendants are inapplicable, for the reason that we cannot say, as a matter of law, that the testimony of either of the accomplice witnesses was discredited or appeared to

be actuated by a desire to avoid punishment, and, further, for the reason that their testimony as to the details and circumstances of the offense is sufficiently corroborated on material points to warrant submission to the jury on the question of the guilt or innocence of defendants. The jury was instructed as to the weight and effect to be given testimony of accomplices, and no objection is made to the instructions given. The testimony of Cameron up to the point of arriving at Hoehn's house and then leaving and that of Wharton up to the point of loading the safe into the truck, and then going home, while unusual, stands uncontradicted by any direct evidence. There is testimony by Hoehn as to the marks on the floor, indicating the route of travel of the safe at the time it was taken, which corresponds sufficiently to Wharton's testimony as to the method used in getting the safe out of the house. Hoehn also testified he saw defendants Linn and Bote at Bote's tavern on his visit there the afternoon of January 18, and that he told them he was departing in the evening for Litchfield, which coincides in some respects with Cameron's and Wharton's testimony as to Bote's alleged statements to this effect and that it would be a good night to commit the offense. The two police officers who testified they heard Bote's voice in the back of the tavern, after closing-time, and the testimony of Virgil K. Adams, to the effect he had seen the defendants, Cameron and Wharton in Bote's tavern about five o'clock, and that he had seen Bote, Schaper, Wharton and Cameron at the Casino tavern the next morning is likewise corroborative. All this testimony in one respect or another conflicts with defense testimony, corroborates materially the testimony of Wharton and Cameron, and unquestionably warranted submission to the jury on the question of defendants' guilt or innocence.

In view of the conflict between the People's and the defendants' evidence on material matters, it was solely

the province of the jury, under proper instructions as to the law, to distinguish the truth from the false and to determine what the truth was as to any given point. In this case, it was necessary for the jury to determine which witnesses were telling the truth and which were not, and in determining this question the jurors had the right to take into consideration, and presumably did so, the manner in which the witnesses testified as well as their conduct and demeanor on the witness-stand. This is the second time a jury has found defendants guilty of the crime of larceny, and after a careful consideration of all the facts and circumstances in this case we cannot say that all defendants have not been proved guilty beyond a reasonable doubt and that the verdict of guilty should not be sustained.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*

GUNN, FARTHING and SMITH, JJ., dissenting:

We are compelled to dissent from the majority opinion. The conviction in this case could not stand without the testimony of the witnesses Wharton and Cameron. The former repudiated his testimony against the defendants given in a former trial and swore that the matters so testified to were false and that he did not know anything about the case. He was called in the present case as a court witness and admitted on cross-examination that he had sworn differently on the former trial. Thus, the former testimony was brought before the jury. It was of no effect in law to prove the People's case but only established that the witness was a perjurer in one case or the other. Matters thus proven by way of impeachment have no further effect than to nullify the testimony of the witness.

Cameron was an ex-convict and was shown to have a grudge against the defendant Bote, and his reputation for truth and veracity was also shown to be bad. There was

no other evidence that established the *corpus delicti*. To say a conviction under such circumstances is proven by evidence beyond a reasonable doubt almost deprives the term "reasonable doubt" of meaning. In a criminal case this court must be convinced of a defendant's guilt beyond a reasonable doubt, and where the conviction is based upon legal evidence the verdict of a jury will not be lightly overruled.

In this case we can see how the jury might regard the impeaching testimony as tending to prove guilt, but this court must consider only the competent evidence tending to prove guilt. We believe the evidence in this case is of such a character both as to quality and competency as to raise a reasonable doubt of the defendants' guilt, and that the conviction should be reversed.