# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Gilliam*, 2013 IL App (1st) 113104

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ATTIM GILLIAM, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-3104 |
| Filed<br>Rehearing denied | November 13, 2013<br>December 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for predatory criminal sexual assault and aggravated criminal sexual abuse of his stepdaughters were upheld where jurisdiction in Illinois was established beyond a reasonable doubt, despite evidence indicating that similar acts occurred while they were living in Indiana, and the trial court's use of the "specific question and response process" in determining whether the prospective jurors understood and accepted the *Zehr* principles complied with Supreme Court Rule 431(b); however, the duplicate DNA and State's Attorney trial fees imposed on defendant were vacated so that defendant was left with only one of each fee where the statute requires only one DNA sample and defendant's two cases were joined and tried in two days with a $50 fee for each day. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 09-CR-3078, 09-CR-3079; the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier and Michael H. Orenstein, both of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Yvette Loizon and Koula Fournier, Assistant State's Attorneys, of counsel), for the People. |

| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion. |
| | Justices Neville and Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1    A jury convicted defendant Attim Gilliam of two counts each of predatory criminal sexual assault and aggravated criminal sexual abuse against his stepdaughters, Beonca W. and Brianna W. Gilliam was sentenced to two natural life sentences for the predatory criminal sexual assaults and two sentences of seven years for the aggravated criminal sexual abuse. Gilliam contends that (i) the manner in which the jury was instructed amounted to plain error where he could have been convicted of criminal acts that occurred outside of Illinois and (ii) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) in admonishing potential jurors on key legal principles. We affirm.

¶ 2    Viewing all the evidence in the light most favorable to the State, we find the essential elements of the crimes, including jurisdiction in Illinois, were proven beyond a reasonable doubt, even though there was some evidence that similar acts of sexual abuse occurred while the defendant and the girls lived in Indiana. Accordingly, we find no error in the jury instructions. Moreover, we find the trial court complied with Rule 431(b) when it used the "specific question and response process" the rule requires and asked the potential jurors whether they understood and accepted the principles set out in the rule.

¶ 3    Gilliam also argues, and the State agrees, that he was assessed duplicate fees for DNA testing and State's Attorney's trial fees. We vacate the duplicate fees assessed against him.

¶ 4                                    BACKGROUND

¶ 5    In 1996, Gilliam lived with his mother in an apartment located on Monroe Street, in Chicago. Gilliam began dating a woman named Tenise, who lived in the apartment building next door. At the time, Tenise had two daughters, two-year-old Beonca and four-month-old Brianna. Gilliam and Tenise eventually married and had three children together. Gilliam and Tenise moved several times, including from Chicago to Indianapolis and then back to Chicago. The couple divorced in 2004.

¶ 6    In 2007, Beonca told an aunt that Gilliam had engaged in sexual acts with her involving

his penis, mouth, and foot. In 2008, Brianna reported similar sexual abuse to an aunt. Following a police investigation of Beonca's and Brianna's allegations, on January 16, 2009, Gilliam was arrested. The next day, Gilliam provided separate written statements regarding each girl to an assistant State's Attorney (ASA).

¶ 7        In his statement regarding Beonca, Gilliam stated that in 1996, he lived with his mother in an apartment on Monroe Street, in Chicago. Gilliam began dating Tenise, who had two daughters, Beonca, two years old, and Brianna, an infant. In 1998, Tenise, Beonca, and Brianna moved in with Gilliam and his mother. In 2000 or 2001, Gilliam moved with Tenise, Beonca, and Brianna into their own apartment on 76th Place. After about four to six months, they moved to Indianapolis. Gilliam and Tenise got married and had three girls of their own together. They all lived in Indianapolis for about two years before returning to Chicago for good in 2003. When they moved back to Chicago, Gilliam, Tenise, and all five children moved into Gilliam's mother's apartment on Monroe Street, and soon his relationship with Tenise started to break up.

¶ 8        Gilliam stated that two or three times while he living on 76th Place, Beonca "started grabbing on him," "coming on to him," and "grabbing his private part, his penis, on the outside of his shorts." Gilliam stated that Beonca, who was about seven years old, would instigate these incidents.

¶ 9        After they moved to Indianapolis in 2001, Gilliam described an incident in which seven-year-old Beonca instigated "touchy-feely" contact and "was coming on to [him]" by "grabbing his penis and being affectionate." On this occasion, his penis came out of the vent of his boxer shorts, and Beonca grabbed his bare penis. Gilliam stated that there was another incident in Indianapolis in which he and Beonca were on his bed. Gilliam stated that Beonca rubbed his penis with her feet on the outside of his boxer shorts and he rubbed Beonca's vagina on the outside of her underwear with his feet.

¶ 10        When they moved back to his mother's apartment on Monroe Street, there was an incident of "playing footsies" with Beonca. At the time, Beonca was about eight or nine years old and, according to Gilliam, instigated the incident. Brianna, who was six or seven years old, was also involved in this incident. Gilliam was on his bed watching television with Beonca and Brianna. Both girls rubbed his penis with their feet and he rubbed both girls' vaginas with his feet. The girls had their underwear on and he went back and forth from one girl to the other, rubbing both of their vaginas. His penis came out of the front vent of his boxer shorts and the girls rubbed his bare penis with their feet. The contact was skin-to-skin. Gilliam stated that he was aroused from this incident and had an erection while the girls were rubbing his penis with their feet. Gilliam stated that this was the last incident of a sexual nature between him and either Beonca or Brianna.

¶ 11        Gilliam stated that Beonca was always the one that instigated the incidents. He and Tenise caught Beonca and Brianna playing with each other in a sexual manner on a few occasions. Gilliam stated that Beonca taught Brianna about sex and made Brianna more "curious" and "aggressive" about sex. Gilliam stated that he never penetrated Beonca, never put his penis inside of her vagina, never put his mouth on her vagina, and never ejaculated on or in front of Beonca. Gilliam explained that he should have been the "bigger man" about

it and resisted Beonca when she was "coming on to him" because she was so young. Gilliam knew what he was doing was wrong and would tell the girls not to tell anybody because he could get in "big trouble." Gilliam stated that he was sorry for what he did, and that he never forced himself on the girls or used strength in any way. He always asked the girls if they were alright with what was going on, if they wanted to do it, and if they felt good about it. Gilliam wanted to make sure the girls were enjoying it and were not uncomfortable in any way. Gilliam knew he should not have done what he did, and hoped that he did not hurt the girls. Gilliam stated that he was treated well by police and the ASA, and provided the statement freely and voluntarily.

¶ 12     In his statement regarding Brianna, Gilliam stated that on one occasion while they were living on 76th Place, Gilliam was home alone with the girls while Tenise was at work. Brianna, who was five years old at the time, started getting "flirtatious" with him. Brianna grabbed his penis while they were in the hallway. Gilliam stated that he was "shocked" by Brianna's behavior and knew that Beonca must have been influencing her. He became aroused and took Brianna into the bathroom, where he pulled down both his and Brianna's pants and underwear, and rubbed his bare penis against the outside of Brianna's bare vagina without penetration. He asked Brianna if she was "ok," and she replied "yes." He told Brianna not to tell anybody about what happened because he could get in a lot of trouble, and told her to leave the bathroom. He then masturbated until he ejaculated. Gilliam stated that while they were living in Indianapolis, a similar incident occurred where he rubbed his bare penis on Brianna's vagina.

¶ 13     Gilliam stated that when they moved back to Chicago from Indianapolis, he, Tenise, and the five children moved into his mother's apartment on Monroe Street. Gilliam again described the incident of "playing footsies" with Beonca and Brianna. As in other statement, Gilliam maintained that this was the last incident of a sexual nature between him and either Beonca or Brianna.

¶ 14     Similar to his earlier statement, Gilliam asserted that Brianna and Beonca were always the ones that instigated the incidents. Gilliam stated that he never penetrated Brianna, never put his mouth on her vagina, and never ejaculated on or in front of her. Gilliam also expressed remorse for what he did to the girls. Gilliam stated that he was treated well by police and the ASA, and provided the statement freely and voluntarily.

¶ 15     Before trial, Gilliam filed a motion to suppress both statements. The trial court denied his motion. The trial court granted Gilliam's motion to join Beonca's and Brianna's cases, and the matter proceeded to trial. With respect to Beonca, Gilliam was charged with 6 counts of predatory criminal sexual assault, 12 counts of criminal sexual assault, 8 counts of aggravated criminal sexual abuse and 8 counts of criminal sexual abuse. With respect to Brianna, Gilliam was charged with two counts of predatory criminal sexual assault, three counts of criminal sexual assault, four counts of aggravated criminal sexual abuse and four counts of criminal sexual abuse. The State proceeded on the counts of predatory criminal sexual assault pertaining to penis to vagina contact and aggravated criminal sexual abuse pertaining to foot to vagina contact for each victim.

¶ 16     Tenise Gilliam testified that she is the mother of Beonca and Brianna. Tenise began

-4-

dating Gilliam in 1996, when Beonca was two years old and Brianna was four months old. After dating Gilliam for four to five months, Tenise and her daughters moved in with Gilliam at his mother's apartment on Monroe Street. Gilliam's brother also lived at the apartment. Tenise testified that she worked full time and Gilliam took care of Beonca and Brianna.

¶ 17    Tenise testified that in 1998, she and Gilliam moved into their own apartment on 76th Place with their newborn daughter as well as Beonca and Brianna. In 1999, Tenise testified that the family moved to Indianapolis, and she had another daughter with Gilliam. Tenise testified that she continued to work full time in Indianapolis while Gilliam cared for the children.

¶ 18    In 2001, Tenise and Gilliam broke up and Tenise moved back to Chicago with all four children. During this time, Tenise lived at her mother's apartment on Monroe Street with the four girls. Gilliam also moved back to Chicago and the children would visit him regularly. In January 2002, Tenise and Gilliam reconciled and got married. The couple had a third child together. Tenise and Gilliam moved back to Indianapolis with their three children, and Beonca and Brianna. The couple lived in Indianapolis for about 11months. In 2003, Tenise and the children moved back to her mother's apartment in Chicago and she divorced Gilliam.

¶ 19    Tenise testified that during the time that she and Gilliam were dating and married, while she was at work Gilliam was responsible for taking care of the children. When Beonca was four years old and Brianna was two years old, Tenise saw the girls "humping on each other." Tenise explained that Beonca was lying flat on the bed and Brianna was on top of her with their bodies moving "up and down." Tenise testified that she asked the girls "what [were] they doing" and they responded that their "daddy play[s] with them like that." Tenise asked Gilliam what the girls meant and he promised that he had never touched them. The following day, Tenise came home from work and saw that Beonca's lip was "busted" and had a crack in it. Tenise asked Beonca what happened to her lip. Beonca responded that she had fallen.

¶ 20    Beonca testified that she was 17 years old, attended high school, and worked at a fast-food restaurant. She identified Gilliam in open court and explained that he was her mother's boyfriend and eventually became her stepfather and called Gilliam "dad." Beonca stated that when her mother and Gilliam were dating, she lived with her mother, her sister Brianna and Gilliam at Gilliam's mother's apartment on Monroe Street. Beonca stated that when she was living with Gilliam, he started sexually abusing her at the age of four. Gilliam would take Beonca to her mother's bedroom, remove her pants, and place her on top of him. Gilliam would then take out his penis and rub it against Beonca's vagina. Beonca explained that this type of sexual abuse occurred during the whole time they lived with Gilliam on Monroe Street and whenever her mother was not home. Beonca testified that the sexual abuse continued until she was nine years old, when Gilliam and her mother broke up. Beonca also confirmed Gilliam's version of the incident of "playing footsies" while she lived with Gilliam at his mother's apartment on Monroe Street.

¶ 21    Beonca testified that Gilliam sexually abused her while they were living in Indianapolis as well. Beonca stated that Brianna was only present one time while Gilliam sexually abused her and Beonca never saw Gilliam sexually abuse Brianna. Beonca testified that Gilliam sexually abused her until she was nine years old. After Gilliam and her mother broke up in

2003, Gilliam did not sexually abuse Beonca again.

¶ 22     Beonca stated that, when she was four years old, she tried to tell her mother about the sexual abuse and her mother confronted Gilliam. But, Beonca did not remember the details of that confrontation. Beonca stated that after she told her mother, Gilliam instructed her never to "tell on him again" and punched her in the mouth with his fist. As a result, Beonca did not tell anyone what Gilliam was doing to her. In 2003, Beonca testified that Gilliam left her mother for good but she did not tell anyone what happened because she was terrified after being hit in the mouth by Gilliam. In 2007, Beonca decided to tell her aunt about the sexual abuse. In 2008, Beonca met with police officers and explained how Gilliam had sexually abused her.

¶ 23     Brianna testified that she was 15 years old and attended high school. Brianna identified Gilliam in open court and testified that he was her mother's boyfriend and eventually became her stepfather. Brianna testified that when she lived with Gilliam in Chicago, it was in an apartment on Monroe Street. Brianna testified that she also lived with Gilliam for a period of time in Indianapolis.

¶ 24     Brianna testified that when her mother and Gilliam separated, Gilliam lived at his mother's apartment on Monroe Street. Brianna and her little sisters would visit Gilliam at his mother's apartment. Brianna confirmed Gilliam's account of the incidents involving penis to vagina contact. Brianna testified that similar incidents also occurred in Indianapolis.

¶ 25     Brianna further confirmed the incident involving "playing footsies" while she was living in Chicago. Brianna testified that she did not remember where she was living at the time of the incident. In 2008, Brianna told her aunt about the sexual abuse and then spoke with police about what Gilliam had done to her.

¶ 26     The parties stipulated that Gilliam was arrested on January 16, 2009, and that Gilliam's date of birth is April 10, 1974. Gilliam's statements to the ASA were also admitted into evidence and published to the jury.

¶ 27     After the State rested its case, Gilliam made a motion for a directed verdict, which the trial court denied. Gilliam rested without presenting any witnesses on his behalf. Following arguments, the jury found Gilliam guilty of two counts of predatory criminal sexual assault for penis-to-vagina contact with both Beonca and Brianna, and two counts of aggravated criminal sexual abuse for foot-to-vagina contact with both Beonca and Brianna.

¶ 28     The trial court denied Gilliam's motion for a new trial. Gilliam was sentenced to natural life for the predatory criminal sexual assault of Beonca and seven years in prison for the aggravated criminal sexual abuse of Beonca. Gilliam was also sentenced to natural life for the predatory criminal sexual assault of Brianna and seven years in prison for the aggravated criminal sexual abuse of Brianna. The trial court denied Gilliam's motion to reconsider his sentences. Gilliam timely appeals.

¶ 29                              ANALYSIS
¶ 30                          Illinois Jurisdiction
¶ 31     Gilliam first contends that the trial court committed reversible error when it failed to

instruct the jury that the State was required to prove that the alleged criminal acts occurred in Illinois, as an element of the charged offenses. Gilliam acknowledges that he forfeited this alleged error for review where he neither objected to the jury instructions at trial nor presented a proposed jury instruction in line with his argument and failed to raise this issue in his posttrial motion. See *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007) (defendant must timely object and file posttrial motion to preserve issue for review and, with respect to the preservation of jury instruction issue on appeal, this requires defendant object to instruction, offer alternative one at trial, and raise issue in posttrial motion). Gilliam requests that we consider this issue under the plain error doctrine.

¶ 32    The plain error doctrine allows us to consider a forfeited error when either (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatens to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affects the fairness of the defendant's trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565. Under both prongs of the plain error analysis, the burden of persuasion remains with the defendant. *Id.* Ultimately, before a plain error analysis may be undertaken, the defendant must show that an error occurred, for, absent error, there can be no plain error. See *People v. McGee*, 398 Ill. App. 3d 789, 794 (2010) (citing *People v. Herron*, 215 Ill. 2d 167, 187 (2005)).

¶ 33    Gilliam notes that where geographic jurisdiction is unclear, the State must prove beyond a reasonable doubt that the relevant acts occurred in Illinois. Gilliam argues that the jury should have been instructed that the State was required to prove jurisdiction, and that without this instruction, it was possible that the jury concluded that some of the charged counts involving Brianna pertained to acts that occurred only in Indiana. We find no error occurred.

¶ 34    The Illinois criminal jurisdiction statute provides that a defendant is subject to prosecution in Illinois for a criminal offense if it is "committed either wholly or partly within the State." 720 ILCS 5/1-5(a)(1) (West 2008); *People v. Young*, 312 Ill. App. 3d 428, 429-30 (2000). Jurisdiction in a criminal case is an essential element that must be proved beyond a reasonable doubt along with the other elements of the offense. *People v. Alexander*, 354 Ill. App. 3d 832, 838 (2004). As with other elements, the State may satisfy its burden of proving jurisdiction by either direct or circumstantial evidence. *Young*, 312 Ill. App. 3d at 430. The test applied in an appeal challenging a criminal conviction based on the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Id.*

¶ 35    The State provided sufficient evidence to prove beyond a reasonable doubt that Illinois had jurisdiction over the charged offenses. The testimony showed that the acts of predatory criminal sexual assault and aggravated criminal sexual abuse occurred in Illinois. Beonca's testimony was unimpeached that Gilliam began sexually abusing her when she was four years old, while she was living at his mother's apartment on Monroe Street. Beonca described Gilliam's frequent conduct of bringing her into her mother's bedroom, removing her clothing, and rubbing his penis on her vagina. Beonca specifically testified that while she and her family lived on Monroe Street, Gilliam engaged in the incident of "playing footsies,"

in which he touched her vagina with his foot. Beonca explained that after she tried to tell her mother about the sexual abuse, Gilliam hit her on the lip with his fist and instructed her not to "tell on his again." Brianna testified that when she was living in Chicago, she and her younger sisters would visit Gilliam at his mother's apartment on Monroe Street. Brianna testified that on more than one occasion, while she was visiting Gilliam, he removed her clothing and rubbed his penis on her vagina. Brianna also confirmed the incident of "playing footsies" while living in Chicago. While Brianna did not remember where she lived at the time of the incidents or whether her mother and Gilliam were separated at the time, she provided consistent testimony regarding the type of sexual abuse and the fact that it occurred in Chicago. Brianna also mentioned that similar incidents of abuse occurred in Indianapolis, but she was not questioned and did not provide details about those incidents.

¶ 36    In addition, the girls' testimony was corroborated by Tenise, who testified that Gilliam was in charge of caring for the girls while she was at work. Tenise described an incident that occurred when Beonca and Brianna were four and two years old, respectively, and the family lived in Chicago. Tenise observed the girls "humping" each other and asked them what they were doing. After Beonca and Brianna responded that was how their "daddy play[s] with them," Tenise confronted Gilliam and he denied ever touching either girl. The next day, Tenise noticed that Beonca had a split lip. Gilliam asserts that this court should draw a negative inference from the State's failure to call the girls' aunt to testify as an outcry witness. But, Beonca testified that she also told her mother about the sexual abuse, and Tenise testified at trial. The girls' testimony was corroborated by each other and their mother.

¶ 37    Further, Beonca's and Brianna's testimony was corroborated by Gilliam's statements. In his statements, Gilliam admitted that he engaged in several acts of sexual abuse with each of the girls while they lived in Chicago. Gilliam admitted to having penis to vagina contact with Brianna while they lived in an apartment in Chicago. Gilliam also described the incident of "playing footsies" with both girls while the family lived at his mother's apartment on Monroe Street in Chicago.

¶ 38    Gilliam contends that without a jury instruction, the jury could have concluded that some counts of the charged offenses, especially involving Brianna, only pertained to acts that occurred in Indiana instead of Illinois. Gilliam's contention is without merit.

¶ 39    The testimony was that the alleged acts of sexual abuse occurred in Chicago. While there was some testimony that similar acts of sexual abuse occurring while Gilliam and the girls lived in Indiana, Gilliam was convicted of two counts of aggravated criminal sexual abuse for foot-to-vagina contact with both Beonca and Brianna, which was an incident both girls testified happened while they were at Gilliam's mother's apartment in Chicago. Gilliam's other convictions were for two counts of predatory criminal sexual assault for penis-to-vagina contact with both Beonca and Brianna, which the girls also testified happened while they were at an apartment in Chicago. The allegations in Gilliam's indictment and evidence presented at trial pertained to alleged criminal acts in Chicago. Thus, we find that the State provided sufficient evidence to prove beyond a reasonable doubt that the alleged criminal acts occurred in Illinois. The location element was not unclear, and, therefore, the trial court was not bound to *sua sponte* issue an instruction on the issue of geographic jurisdiction. See *People v. Lewis*, 97 Ill. App. 3d 982, 987 (1981) (trial court was not required to instruct the

-8-

jury on its own initiative as to lesser included offense of voluntary manslaughter); *People v. Leppert*, 105 Ill. App. 3d 514, 517-18 (1982) (in prosecution for attempted murder, trial court was not required to give, *sua sponte*, instruction on aggravated battery).

¶ 40   Gilliam, nonetheless, argues that the jury instructions were erroneous where they omitted the element of jurisdiction. The purpose of jury instructions is to provide the jury with correct legal principles that apply to the evidence, thereby allowing the jurors to reach the proper conclusion based on the applicable law and the evidence as presented. *People v. Parker*, 223 Ill. 2d 494, 500 (2006). Supreme court rules require a circuit court to use Illinois Pattern Jury Instructions that are both (1) applicable to the facts and law of the case; and (2) correct statements of law. *People v. Polk*, 407 Ill. App. 3d 80, 108 (2010). Specifically, Supreme Court Rule 451(a) states that a trial court "shall" use the pattern criminal instruction when it is "applicable in a criminal case, giving due consideration to the facts and the governing law *** unless the court determines that it does not accurately state the law." Ill. S. Ct. R. 451(a) (eff. July 1, 2006). Where there is no pattern jury instruction on a subject on which the court determines the jury should be instructed, the court has the discretion to give a non-pattern instruction. *People v. Hudson*, 222 Ill. 2d 392, 400 (2006).

¶ 41   A reviewing court will reverse a trial court's determination as to what instructions to give only if it finds that the trial court abused its discretion. *People v. Walker*, 392 Ill. App. 3d 277, 293 (2009). In making this determination, we are to examine whether the instructions given, when taken as a whole, fairly, fully and comprehensively apprised the jury of the relevant law. *Parker*, 223 Ill. 2d at 501.

¶ 42   Reviewing the jury instructions given by the trial court as a whole, we find no error. The jury instructions fairly and fully stated the law as it related to the evidence. The jury received, among other instructions, Illinois Pattern Jury Instructions, Criminal, No. 11.104 (4th ed. 2000) (hereinafter, IPI Criminal 4th), which covered the necessary elements for the charged offenses of predatory criminal sexual assault. The jury also received IPI Criminal 4th No. 11.62A, which instructed it on the elements for the charged offenses of aggravated criminal sexual abuse. While Gilliam contends that "the jury, if asked, might well have doubted that any sexual conduct against [Brianna] was in Illinois," we reject Gilliam's speculative argument and decline to invade the jury's role as the trier of fact. *People v. Carrilalez*, 2012 IL App (1st) 102687.

¶ 43   As previously discussed, the trial testimony was clear that the alleged acts of sexual abuse occurred in Chicago, Illinois. While there was some testimony that similar acts of sexual abuse occurred while Gilliam and the girls lived in Indiana, Gilliam's convictions cannot be reversed on this basis where, viewing all of the evidence in the light most favorable to the State, we find that the essential elements of the crimes, including jurisdiction in Illinois, were proven beyond a reasonable doubt. See *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007) (trier of fact is not required "to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt" (internal quotation marks omitted)).

¶ 44   Because we find no error in the trial court's jury instructions, we decline to review Gilliam's claim under plain error analysis. We also need not consider Gilliam's alternative

argument that trial counsel was ineffective for failing to object to the jury instructions at trial and include the issue in his posttrial motion.

¶ 45                          Compliance With Supreme Court Rule 431(b)

¶ 46    Gilliam next contends that the trial court erred when it failed to inquire whether potential jurors "understood" and "accepted" the principles identified in Supreme Court Rule 431(b). Gilliam also argues that the trial court violated Rule 431(b) in that the court did not ask prospective jurors whether they understood and accepted the principle that a defendant is not required to offer any evidence on his or her own behalf. Gilliam concedes that he failed to preserve the issue of Rule 431(b) compliance because he failed to object or raise the issue in a posttrial motion. But, Gilliam maintains that we may consider his claim under the plain error doctrine despite his procedural default because the evidence was closely balanced.

¶ 47    As discussed earlier, the plain-error doctrine is used to bypass normal forfeiture principles and to allow a reviewing court to consider unpreserved claims of error in specific circumstances. *People v. Averett*, 237 Ill. 2d 1, 18 (2010). The plain-error doctrine allows errors not previously challenged to be considered on appeal if either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565. We first consider whether error occurred.

¶ 48    At issue is compliance with Rule 431(b). We review compliance with supreme court rules and determine the consequences, if any, that flow from noncompliance *de novo*. See *People v. Wilmington*, 2013 IL 112938, ¶ 26. The version of Rule 431(b) in effect when Gilliam was tried provided:

    "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

    The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 49    Before the *voir dire* of individual panel members, the trial court admonished the entire group of potential jurors about the principles set forth in the rule as follows:

    "All right, now the defendant is presumed to be innocent of the charges against him. This presumption remains with the defendant throughout the trial and is not overcome unless by your verdict you find that the State has proven the defendant guilty beyond a reasonable doubt.

-10-

Does anybody have any quarrel with this proposition of law, the presumption of innocence? If so, raise your hand.

Let the record reflect there are none.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains upon the State throughout the trial.

Does anybody have any quarrel with this proposition of law, the burden of proof? If so raise your hand.

The record reflect there are none.

The defendant is not required to prove his innocence. Does anybody have any quarrel with this proposition of law? If so, raise your hand."

The trial court noted that prospective juror number 9 raised her hand. The court continued:

"The defendant has the absolute right to remain silent, and he can elect to sit there, not testify in his own defense and rely on the presumption of innocence. You may draw no inference from the fact that the defendant chooses to remain silent. Either in favor of or against the defendant because he elects to remain silent. Anybody have any quarrel with this proposition of law, the right of the defendant to remain silent? If so, raise your hand."

The trial court noted that prospective juror number 9 again raised her hand. The court continued:

"All right, now ladies and gentlemen, to give you an idea of the way these four propositions of law work, if you put them all together, if I took the first 12 of you right now whose names were called and gave you your verdict forms and told you to go back in that jury room and deliberate and reach a verdict, could you do it? And right now I'm sure there's somebody thinking at least one, doggone it, Judge, how do you expect me to decide this case, if I haven't heard any evidence? You see but that would be wrong because since the defendant is presumed to be innocent of the charges against him, and you've heard no evidence to remove that presumption, and since the State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and you've heard no evidence from them to sustain their burden, and since the defendant is not required to prove his innocence, you can't consider the fact that he hasn't called any witnesses or put on a defense case. And since the defendant has the absolute right to remain silent and you can't either consider that either for or against him. The only possible verdict you could come back with right now at this moment would be not guilty.

Those are the way *** those four propositions of law work, if you put them all together.

Is there anybody here, other than [prospective juror number 9] who cannot apply those four propositions of law in the manner that I've indicated? If so, raise your hand.

All right, then I take it that all of you both understand and accept these four propositions of law. If not, raise your hand.

The record reflect[s] there are none."

¶ 50   Gilliam now contends that the trial court violated Rule 431(b) in that the court did not

ask potential jurors whether they understood and accepted the principle that he was not required to offer any evidence on his or her own behalf. Gilliam asserts that the trial court also erred by asking only whether the prospective jurors had "any quarrel" with the other three principles enumerated in the rule, but not asking whether they also "understood" those three principles.

¶ 51 The State relies on *People v. Digby*, 405 Ill. App. 3d 544, 548 (2010), to argue that specific language is not required to demonstrate that the trial court complied with Rule 431(b). In *Digby*, the trial court asked potential jurors whether they "had a problem" with the presumption of the defendant's innocence, whether they "disagreed" with the State's burden of proof, and whether they would hold defendant's failure to testify against him. *Digby*, 405 Ill. App. 3d at 548. Finding no error, the court held that although the trial court "did not use the precise language of Rule 431(b), the words it did use were appropriate and clearly indicated to the prospective jurors that the court was asking them whether they understood and accepted the principles enumerated in the rule." *Digby*, 405 Ill. App. 3d at 548. Our supreme court, however, later addressed this issue in *People v. Wilmington*, 2013 IL 112938. That case holds that the trial court failed to comply with Rule 431(b) when it asked prospective jurors whether any of them disagreed with the principles of law. In doing so, the court stated:

"As this court stated in *Thompson*, Rule 431(b) requires that the trial court ask potential jurors whether they *understand* and *accept* the enumerated principles, mandating 'a specific question and response process.' *Thompson*, 238 Ill. 2d at 607. While it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself. Moreover, the trial court did not even inquire regarding the jury's understanding and acceptance of the principle that defendant's failure to testify could not be held against him. Thus, error clearly occurred." (Emphases in original.) *Id.* ¶ 32.

¶ 52 Here, the trial court initially asked the prospective jurors if they had "any quarrel" with the principles under Rule 431(b). The trial court went on to offer a hypothetical example to explain how the four principles enumerated in the rule work. After this example, the trial court asked the potential jurors, "Is there anybody here *** who cannot apply those four propositions of law in the manner that I've indicated? If so, raise your hand. *** All right, then I take it that all of you both *understand* and *accept* these four propositions of law. If not, raise your hand." (Emphases added.) Therefore, the record shows that the trial court asked the potential jurors whether they understood and accepted the enumerated principles, and used the "specific question and response process" required by Rule 431(b). See *Wilimington*, 2013 IL 112938 ¶ 32.

¶ 53 Gilliam also asserts that the trial court did not comply with Rule 431(b) where it failed to ask the prospective jurors whether they accepted the third principle, namely, that a defendant is not required to offer any evidence on his or her own behalf. We disagree.

¶ 54 The record shows that the trial court initially asked the potential jurors if they had "any quarrel" with the proposition that "The defendant is not required to prove his innocence."

The trial court then went on to explain how the four principles work, including the proposition that "the defendant is not required to prove his innocence, you can't consider the fact that he hasn't called any witnesses or put on a defense case." The trial court then asked the potential jurors to raise their hands if they did not "both understand and accept" the four principles of law. Thus, the trial court inquired into the potential jurors' understanding and acceptance of the principle that Gilliam was not required to offer any evidence on his own behalf. Consequently, we find no error with respect to the court's Rule 431(b) admonitions to the potential jurors.

¶ 55    We note that even if the trial court's admonishments did not comply with the precise language, and question and response process mandated by Rule 431(b), any error would not rise to the level of plain error in this case. First, as previously discussed, the evidence was not closely balanced where Beonca and Brianna testified consistently about the acts of sexual abuse, and their testimony was corroborated by their mother and Gilliam's statements. Second, Gilliam has not established that any violation of Rule 431(b) resulted in a biased jury. *Wilmington*, 2013 IL 112938, ¶¶ 33-34.

¶ 56                                Duplicate Fees

¶ 57    Gilliam lastly argues, and the State agrees, that the trial court improperly imposed duplicate fees: two $200 DNA fees and two $100 State's Attorney trial fees. The trial court imposed a $200 DNA fee for each case in which Gilliam was convicted (No. 09 CR 3078 and No. 09 CR 3079). But, the statute only requires one DNA sample to be collected from Gilliam and stored in the DNA database. 730 ILCS 5/5-4-3 (West 2008); see also *People v. Marshall*, 242 Ill. 2d 285, 300 (2011).

¶ 58    The trial court also imposed two $100 State's Attorney trial fees, although Gilliam's two cases were joined and tried together before a jury for two days. Thus, only a single $100 trial fee should have been assessed for the two days of trial, $50 for each day of trial. 55 ILCS 5/4-2002.1(a) (West 2008).

¶ 59    Accordingly, we vacate the portion of the trial court's order requiring Gilliam to pay duplicate fees of $200 for DNA fees and $100 for the State's Attorney trial fees. The order should reflect only one $200 DNA fee and one $100 State's Attorney trial fee.

¶ 60                                CONCLUSION

¶ 61    We affirm Gillian's convictions where the jury was properly instructed in this case and the evidence clearly established that the alleged criminal acts occurred in Illinois.

¶ 62    We also find that the trial court complied with Rule 431(b) in admonishing potential jurors on key legal principles.

¶ 63    We vacate the portion of the trial court's order requiring Gilliam to pay duplicate fees of $200 for DNA fees and $100 for the State's Attorney trial fees.

¶ 64    Affirmed.