THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT WHITAKER, Defendant-Appellant.

First District (5th Division)    No. 1—92—1143

Opinion filed May 27, 1994.

Michael J. Pelletier and Maria A. Harrigan, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Lawrence Page, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Defendant, Robert Whitaker, was charged by indictment with sexually abusing an 11-year-old boy, A.S., on or about March 31, 1991. Following a jury trial, defendant was convicted of aggravated criminal sexual abuse and sentenced to four years' imprisonment. On appeal, defendant argues that the trial court erred in instructing the jury that the State was not required to prove that he committed the offense charged on the date stated in the indictment.

We affirm.

BACKGROUND

The following evidence was adduced at trial. C.S. (Mrs. S.) testified that in March 1991, she and her husband lived in Round Lake Beach, Illinois, with their five children: A.S., E.S., M.S., Jy.S. and J.S. Defendant, who was a friend of the family, moved in with the S. family two to three years prior to the date of the charged offense. At the time, Mrs. S. worked two jobs and Mr. S. was in and out of a veteran's hospital. Since defendant frequently babysat for the children when Mr. and Mrs. S. were not at home, he did not pay room and board. Defendant took the children out to dinner, to Cub games and other outings. He also frequently took the children to his mother's home at 4938 N. Winthrop in Chicago on the weekends.

Mrs. S. testified that there were three bedrooms in the S. home. She and her husband slept in one room with their infant son, J.S. Her two daughters, E.S. and M.S., slept in a second room, and the remaining boys, A.S. and Jy.S., slept in the third room with defendant. According to the S. family, defendant and A.S. slept in one bed and Jy.S. slept in the other. Mrs. S. testified that they had initially intended for A.S. and Jy.S. to sleep in the same bed, but that pattern never developed.

In February of 1991, Mr. S. enrolled in a police academy in Texas and moved to Texas with his youngest son, J.S.; Mrs. S. and the other four children planned to join him in April. During the weekend of March 22-24, Mrs. S. was packing in anticipation of their move to Texas.

On Friday, March 22, 1991, Sue Peasly, a friend and neighbor, threw a going away party for the S. family. All of the members of the S. family who were still living in Round Lake Beach attended the party. After the party was over, the S. children went with defendant to his mother's home in Chicago. Mrs. S. and Ms. Peasly testified that all of the children left with defendant on Friday night and that the two girls returned by train to Round Lake Beach on Saturday morning. However, A.S. testified that he and Jy.S. went to stay at

defendant's mother's house, but his sisters stayed home to help his mother pack. That weekend, defendant's brother John Nichols (John), John's girlfriend Darla Robinson (Darla), their two daughters, defendant's mother and her boyfriend all stayed at defendant's mother's home as well.

A.S. stated that on Saturday, March 23, 1991, he slept on a bed in the kitchen with defendant. He testified that defendant "started messing" with him. He explained that defendant "started rubbing [his] penis and [his] butt." A.S. stated that he was wearing pants and underpants at the time and defendant put his hand underneath both garments.

A.S. testified that this was not the first time that defendant had touched him in this manner. The first time it had happened, A.S. was eight years old, and defendant had lived at the S. residence for approximately one month. A.S. stated that throughout the following three years, defendant had touched him almost every night. He explained that he never told anyone because he was scared that defendant would do something to him. Several times when defendant was rubbing him, he tried to pull defendant's hand away and defendant slapped him in the face. Frequently, before defendant began touching him, defendant would promise to take him places and buy him things, such as Nintendo games.

On March 25, 1991, A.S. and Jy.S. were with defendant in his candy store when the police came and arrested defendant. (Defendant was arrested in connection with charges independent of the ones in the case at bar.) The officers took him and Jy.S. with them to the station. While he was there, A.S. spoke with Officers Peggy O'Conner and Dale Altman. At first, he told them nothing, but later he told them what had happened between him and defendant. He explained that he told the officers about defendant because he thought that they probably already knew that something was going on.

Officer Steve Janka testified that at about 5:30 p.m. on March 25, 1991, he went to 5432 N. Clark Street and arrested defendant. Officer Janka stated that the children were taken to the police station because defendant was the only one supervising them at the time of the arrest. Officer Janka testified that as defendant and A.S. sat on a bench in the police station, defendant kept pulling A.S. toward him and hugging A.S. Although A.S. kept moving away from defendant, defendant kept pulling A.S. back next to him.

Officer O'Conner testified that she was employed in the youth division of the Chicago police department and that she was working with Officer Altman on March 25, 1991. She stated that she and Officer Altman spoke with A.S. and she asked A.S. about the sleeping

arrangements in his home. A.S. responded that he shared his bedroom with defendant. He told the officers that he had come to Chicago on Friday to spend the week at defendant's mother's home. A.S. also told the officers that on the night of March 23, 1991, defendant had fondled his penis and butt in the bed at defendant's mother's home.

Officer O'Conner also spoke with defendant while Officer Altman and Assistant State's Attorney Jack Howard were present. Defendant stated that he lived with the S. family and he had known them approximately three to four years. He explained that he often babysat the children. Defendant stated that he slept in the same bed with A.S. in Round Lake Beach and at his mother's residence. He told the officers that he had brought A.S. and Jy.S. to Chicago on Friday night to spend spring break at his mother's home. He denied sexually abusing A.S.

The next morning Mrs. S. took both of her sons to Mount Sinai Hospital, where they were examined by staff members who were specially trained to deal with abused children. Dr. Marisa Aquilla testified that she worked in the pediatric ecology unit of Mount Sinai Hospital, and on March 26, 1991, A.S. was referred to her for an evaluation. She stated that she asked A.S. if anyone had touched him on his penis or his butt. A.S. responded, "Bob [defendant] touched my penis." He also stated that defendant would squeeze his penis and touch his butt. A.S. told her that this had been going on for three years and it would occur in his room. He stated that he did not tell anyone because he was scared. Dr. Aquilla also performed a physical examination on A.S.; the examination showed normal genital findings, but did not rule out sexual abuse.

Ms. Peasly testified that she had known the S. family since October 1988, and she had known defendant, who lived with the S. family, almost as long. Ms. Peasly lived in the same apartment complex as the S. family and she often babysat for the children. She stated that she was aware that A.S. and defendant slept in the same bed because she had observed them in bed on several occasions. On one occasion when she was looking for defendant, she tried to open the door to the bedroom which A.S. and defendant shared. Initially, the door would not open, but as she continued to push on it, it gave way and the piece of plywood which had been barricading the door fell down. She then observed defendant and A.S. sitting on their bed together, though it was mid-afternoon at the time. Ms. Peasly stated that neither defendant nor any member of his family attended the going away party. She denied that defendant stored his things in her apartment in anticipation of the S. family's move.

Darla, defendant's brother's girlfriend, testified for the defense. She stated that she became friends with Ms. Peasly through defendant and the S. family. Ms. Peasly was very interested in defendant and she would frequently ask questions about him. On Wednesday, March 20, 1991, Ms. Peasly telephoned Darla and asked her whether defendant was going to move to Chicago or move in with Ms. Peasly. Darla did not know, but she gave Ms. Peasly defendant's pager number. Later that afternoon, defendant called Darla and told her that Ms. Peasly was angry at him because he did not want to move in with her and she had threatened to put all of his things outside. The following day, Darla, John and their two daughters drove up to Round Lake Beach to assist defendant in moving his things.

After they arrived at the S. family home, John went over to Ms. Peasly's home and discovered that she had put some, but not all, of defendant's things on the back porch. Darla, John and their daughters spent that night at the S.s' home. The next day, Friday March 22, 1991, Darla, John, their children, Mrs. S. and her four children went to Ms. Peasly's for the going away party. The group returned from the party around 9 p.m. and went back to the S.s' house. Shortly thereafter, defendant, Darla, John, their children and the S. children drove to defendant's mother's home in Chicago. Darla testified that defendant slept on a bed in the kitchen, she and John slept on a bed in the living room, and all of the children slept on various mattresses and couches in the living room. Darla testified that none of the children had ever slept on the kitchen bed.

On the evening of Saturday, March 23, 1991, around 5:30 p.m., Darla went to the home of defendant's mother's neighbors (the Minors). Mr. and Mrs. Minor, an out-of-town friend, defendant, John, Darla's children, and the S. children were there. The children played Nintendo while the male adults played cards. Darla testified that she, her children, and all of the S. children except A.S. left the Minors' at 10:30 or 11 p.m. The younger children went to sleep while Darla and E.S. stayed up to watch videos on television. Darla and E.S. went to bed around 1:30 a.m. Darla testified that defendant came home between 2:30 and 3 a.m., and she observed him carry A.S., who was asleep, to the couch in the living room, where he had slept the night before. She stated that all of the children slept in the same place that they had slept the night before and defendant again slept in the kitchen.

Darla testified that on Sunday morning, defendant drove E.S. and M.S. to the train station and they went back to Round Lake Beach; A.S. and Jy.S remained at defendant's mother's home. That evening, defendant and John went back to the Minors' house and played cards

again. According to Darla, defendant took A.S. with him and Jy.S. remained at home. Darla testified that they returned at about 2:30 a.m. and A.S. again slept on the couch.

Defendant testified that although he was invited to the going away party at Ms. Peasly's home, he did not go to the party; instead, he remained at the S. home. Defendant had discussed moving in with Ms. Peasly a couple months before the S. family moved, and at some point he had moved his belongings into her apartment. According to defendant, Ms. Peasly wanted him to move in with her and babysit for her children, so that she could go back to work. Defendant stated that on Wednesday March 20, 1991, he told Ms. Peasly that he would not be moving in with her and she became very angry. She also put his belongings out on the porch.

On Thursday, March 21, John and Darla came out to Round Lake Beach and stayed overnight at the S. home. Following the party on Friday night, the S. children accompanied defendant to Chicago and stayed with him at his mother's home. Defendant testified that all of the children slept in the living room with John and Darla, while he slept in the bed in the kitchen.

On Saturday March 23, 1991, defendant spent most of the day and evening playing cards at his mother's neighbors' house. He testified that he came back to his mother's home about 2:30 or 3 a.m. Sunday morning with John, Jy.S., and A.S.; the girls had left earlier with Darla. Again, defendant testified that all of the children slept in the living room with Darla and John, while he slept in a bed in the kitchen.

Defendant testified that later Sunday morning he drove M.S. and E.S. to the train station. Sunday evening he went back over to the neighbors' to play cards and the boys, A.S. and Jy.S., were with him. He stated that he returned to his mother's at about 2 a.m.

Defendant denied ever sleeping in the same bed as A.S. in Round Lake Beach or at his mother's home in Chicago, and he denied telling the police officers or the assistant State's Attorney that he had slept in the same bed as A.S. in Round Lake Beach or in Chicago. Defendant testified that A.S. always slept on the couch in the living room when he stayed overnight at his mother's home in Chicago. Defendant denied that there was ever a piece of plywood in A.S.'s bedroom and that he and A.S. were in bed. He stated that Ms. Peasly did not come into A.S.'s bedroom at any time. Defendant testified that he bought all of the children, including A.S., gifts from time to time.

E.S. testified in rebuttal for the State. She stated that John, Darla, and their children were not at the going away party, but defendant was there on and off. After the party, she, M.S., Jy.S., and

A.S. went with defendant to his mother's home in Chicago. They spent Friday night there and then she and M.S. took the train back to Round Lake Beach on Saturday morning.

At the conclusion of the trial, the jury found defendant guilty of aggravated criminal sexual abuse. Defendant filed a timely notice of appeal.

OPINION

■ Defendant contends that the trial judge erred by submitting the following instruction to the jury:

"The indictment states that the offense charged was committed on or about March 23, 1991. If you find that the offense charged was committed, the State is not required to prove that it was committed on the particular date charged." Illinois Pattern Jury Instructions, Criminal, No. 3.01 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 3.01).

Defendant concedes that the State is generally not required to prove that a crime was committed on a particular date (see *People v. Olroyd* (1929), 335 Ill. 61, 68; *People v. Quiroz* (1993), 253 Ill. App. 3d 739, 747; *People v. Wheeler* (1991), 216 Ill. App. 3d 609, 620, *rev'd on other grounds* (1992), 151 Ill. 2d 298), and that an instruction to that effect is not inherently improper (see *People v. Bote* (1942), 379 Ill. 245, 258-59; *Quiroz*, 253 Ill. App. 3d at 747-48; *Wheeler*, 216 Ill. App. 3d at 620). However, defendant maintains that the giving of IPI Criminal 2d No. 3.01 was improper under the particular facts of this case.

Defendant first argues that IPI Criminal 2d No. 3.01 should not be given when the State has filed a bill of particulars specifying the date and time of an offense. Defendant relies on the Committee Note to IPI Criminal 2d No. 3.01, which provides:

"This instruction should be given only when there is a variance between the date alleged and the evidence, and all dates are within the period of limitations. It should not be given if the State has filed a bill of particulars stating the date of the crime." IPI Criminal 2d No. 3.01, Committee Note, at 18.

Initially, we note that the bill of particulars provides no more specificity about the date of the offense than the indictment. Both documents state that the offense occurred "on or about March 23, 1991." Next, the committee comments are not law and the trial court is allowed to deviate from the suggested instructions and format where necessary to conform to unusual facts or new law. (See *People v. Neely* (1984), 121 Ill. App. 3d 616.) Finally, and most importantly, defendant was not prejudiced by the giving of the instruction.

The giving of IPI Criminal 2d No. 3.01 may result in reversible

error if the inconsistencies between the date charged in the indictment and the evidence presented at trial are so great that the defendant is misled in presenting his defense, or when the defendant presents an alibi for the time alleged in the indictment and is thereby prejudiced because he failed to gather evidence and witnesses for the time actually proved by the State. (*People v. Wheeler*, 216 Ill. App. 3d at 620.) Defendant complains that he was prejudiced because the State presented evidence that he abused A.S. over a three-year period in Round Lake Beach, and he was unable to defend against these vague allegations. We disagree.

Both the State and defendant focused their case on the weekend of March 22-24, with particular emphasis on Saturday, March 23, 1991. Defendant provided a detailed account of the events which took place on the weekend of March 22-24, which if believed, tended to show that he did not sexually abuse A.S. during the course of that weekend. Although evidence of similar incidents which occurred at other times was presented, this evidence was admitted for the limited purpose of showing intent and lack of mistake, and the jury was instructed accordingly. Moreover, defendant denied sleeping with or sexually abusing A.S. at any time.

■ Defendant next contends that by giving both IPI Criminal 2d No. 3.01 and IPI Criminal 2d No. 3.14, the trial court confused the jury. IPI Criminal 2d No. 3.14 provided:

"Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment. This evidence has been received solely on the issue of the defendant's intent [and lack of mistake]. This evidence may be considered by you only for the limited purpose for which it was received."

As we previously noted, this instruction was properly given for the purpose of limiting the jurors' consideration of the evidence of abuse committed at times other than the weekend of March 22-24. We are not persuaded that the instructions confused the jury. Instead, viewing the instructions in their entirety, as we must, we find that they fairly and accurately stated the law.

■ Finally, defendant contends that by giving IPI Criminal 2d No. 3.01, the court erroneously allowed the jury to convict him based upon evidence of incidents which occurred outside of Cook County. It is true that venue is a material element of an offense and that it must be proved beyond a reasonable doubt to sustain a conviction. (See *People v. Allen* (1952), 413 Ill. 69, 76.) However, if defendant was concerned about proof of venue, the proper course of action would have been to request an instruction advising the jury that the State

had the burden of proving venue. Defendant did not submit a venue instruction; instead, he objected to a legitimate instruction which addressed an entirely separate issue—the date the offense occurred. Moreover, the giving of IPI Criminal 2d No. 3.01 was appropriate given the facts of this case. A.S. told the officers that defendant fondled him while they were in bed together at approximately 11 p.m. on Saturday, March 23, 1991. It is quite possible that the offense may have occurred shortly before or after 11 p.m., and if it occurred more than an hour after 11 p.m. then the date would have been March 24, 1991. It is within the discretion of the trial court to determine which instructions to submit to the jury (*People v. Wells* (1993), 241 Ill. App. 3d 141, 148; *People v. Dower* (1991), 218 Ill. App. 3d 844, 852), and we cannot say that the trial court abused its discretion in this case.

Affirmed.

MURRAY, P.J., and McNULTY, J., concur.