Rule 23 order filed
September 19, 2018;
Motion to publish granted
October 2, 2018.

2018 IL App (5th) 150087

NO. 5-15-0087

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Lawrence County. |
| | ) | |
| v. | ) | No. 14-CF-20 |
| | ) | |
| JAMES E. CHOATE III, | ) | Honorable |
| | ) | Robert M. Hopkins, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Justices Cates and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, James Choate III, appeals his conviction for predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). The charge stemmed from abuse of the defendant's stepdaughter, Stephanie S. The incident at issue took place shortly after the family moved from Indiana to Illinois. Although the evidence at trial was focused on events that took place in Illinois on a specific date, there was also evidence that the defendant abused his stepdaughter in Indiana. The jury was instructed that the State did not have to prove that the abuse occurred on a specific date. The jury was not instructed that the State had to prove that the offense occurred in Illinois. The defendant contends that these instructions allowed the jury to find him guilty based on conduct that occurred in Indiana, contrary to the rule of criminal jurisdiction. See *id.* § 1-5(a)(1) (providing that a criminal defendant is subject to prosecution in

1

Illinois only for conduct that occurred at least partially within the state). He argues that trial counsel was ineffective for failing to request an instruction on jurisdiction or to object to the instruction telling jurors that the State did not have to prove that the offense took place on the date specified in the charge. He also argues that the court did not comply with the requirements of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and *People v. Zehr*, 103 Ill. 2d 472 (1984), during *voir dire*. We affirm.

¶ 2 The defendant began a relationship with Stephanie's mother, Tonya, in 2012. At that time, Stephanie was seven years old. The defendant and Tonya married in December 2013. Throughout the relationship, the family moved numerous times, usually staying with relatives. They lived at various places in Indiana. Early in January 2014, they moved to Sumner, Illinois, where they shared a trailer with Tonya's cousin, Joseph A., his wife, Ashley, and their two children, one-year-old Joseph Jr. and three-month-old Jacob. In the early morning hours of January 30, Jacob was rushed to the hospital with life-threatening head injuries. The defendant stayed in the trailer with Stephanie while the other adults went to the hospital with the baby. That is when the events at issue took place.

¶ 3 The Department of Children and Family Services (DCFS) became involved due to the severity of Jacob's injuries, which were determined to have been inflicted by Joseph. DCFS investigator Jay Reeves took Joseph Jr. into protective custody. He learned from the adults in the family that eight-year-old Stephanie also lived in the trailer. Reeves drove to Stephanie's elementary school to take her into protective custody as well. In the car, Stephanie told Reeves that she had a secret. She told him that the defendant touched her "private part" and made her touch his "private part." She said that this happened more than once, and that the last time it

2

happened was that morning. Reeves reported Stephanie's allegations to the police and scheduled a forensic interview for her the following day at the Healing Harbor Child Advocacy Center.

¶ 4    This matter came for trial in November 2014. Jay Reeves testified that he received a call at approximately 4 a.m. on January 30, 2014, to investigate a case involving a three-month-old baby with life-threatening injuries. At the police station, he spoke with the adults who lived in the trailer with the baby. He learned from them that there were two other children living in the trailer—the baby's 15-month-old brother, Joseph Jr., and his 8-year-old cousin, Stephanie. When Stephanie's mother, Tonya Choate, indicated that she intended to continue living in the trailer, Reeves told her that he needed to take both Joseph Jr. and Stephanie into protective custody. At this time, Joseph Jr. was at the police station with the adults, the baby had been airlifted to a hospital in Indiana, and Stephanie was at school.

¶ 5    Reeves left the police station with Joseph Jr. and drove to Stephanie's school. He testified that after he explained to Stephanie why he was picking her up, he drove the two children to a doctor's office for an initial health screening. Reeves explained that this was standard DCFS procedure. He testified that he then drove the two children to their foster home, a drive of about 100 miles.

¶ 6    Reeves testified that during the drive, Stephanie asked if she could call him "Dad." She told him that this was what she called all of the men who took care of her. Stephanie referred to three different men as her dads—her biological father, Levi, her previous stepfather, Doc, and the defendant, whom she also called Jimmy. Reeves explained to Stephanie that although it was his job to make sure that she and her little cousin were safe, he would not take care of them the same way a dad would take care of them. He told her that she could call him either Jay or Mr. Reeves. He then asked her which of her  daddies she liked best. According to Reeves, Stephanie

3

told him that she did not like Doc, and she described instances of physical abuse by him. She told Reeves that her favorite daddy was either Levi or Jimmy.

¶ 7    Reeves testified that after a pause in the conversation, Stephanie told him that she had a secret, but she did not know if she should tell him her secret because her mother would be angry. Reeves assured her that it was his job to listen to her and that she would not get into trouble for telling him her secret. Reeves testified that Stephanie then told him that Jimmy touched her "private part" and made her hand touch his "private part." She told Reeves that this happened more than once and that the last time was that morning. She explained that she woke up that morning because she felt the defendant rubbing her "private part." She told Reeves that the defendant also held onto her hand and made her rub his "private part." Reeves testified that Stephanie asked him, "Why doesn't he do that with his own hand?" Reeves told her he did not know why. He testified that Stephanie then told him that she was afraid she would get into trouble with her mother for telling him this. When he asked her why, Stephanie explained that her mother grounded her for two weeks just for talking to someone from DCFS in Indiana. She also told Reeves that she knew her mother loved Jimmy. She told him that she, too, liked Jimmy except when he was touching her "private."

¶ 8    Teresa Miller, the forensic interviewer who conducted an interview with Stephanie, also testified for the State. During her testimony, a video recording of the interview was played for the jury. As soon as Stephanie and Miller sat down at a table to begin the interview, Stephanie noticed the video camera and asked Miller, "Is that a camera?" Miller explained that the interview was being recorded so that Stephanie would not have to tell her story more than once. She assured Stephanie that her mother and father would never see the recording. She asked Stephanie, "Does that make you feel better?" Stephanie shook her head yes, but Miller

4

apparently thought she continued to look apprehensive. She asked Stephanie, "You look a little worried. What are you thinking?" Stephanie replied, "I'm thinking that it's just that most people lie to me." Miller reassured Stephanie and promised never to lie to her.

¶ 9    Miller then began the interview by asking Stephanie to tell her about herself and her family. Stephanie told Miller that she was born in Washington, Indiana, and that her family moved around a lot. She told Miller that they recently moved into a trailer in Sumner, Illinois. The other people who lived in the trailer were Colby, Ashley, Jacob, Joseph, and Mom and Dad. Miller asked if any of the people she named were adults. Stephanie explained that Jacob and Joseph were babies and the other individuals were adults. (We note that although Stephanie does not clarify this, we presume that she refers to 15-month-old Joseph Jr. as "Joseph" and that "Colby" is a nickname for Joseph Sr.) When Miller asked if she knew what names other people called her mom and dad, Stephanie was reluctant to answer. She told Miller that her mom got angry at her if she used their first names. After Miller assured her that her mother would not see the video recording, Stephanie told her that the names of her parents were Tonya and Jimmy. She clarified that Jimmy was her stepfather; her "real dad" was Levi.

¶ 10   Miller then turned Stephanie's attention to her allegation of abuse. She began by asking Stephanie what she told Jay Reeves the previous day. Stephanie said that she told Reeves that she woke up to Jimmy putting her hand on his "private" while her mom was at the hospital with the baby. She told Miller that this happened in the trailer in Sumner. She told her that the defendant was sitting on her bed when he did this. She said that he moved her hand to make her rub his "private."

¶ 11   Stephanie told Miller that the same thing happened when she lived in Vincennes and Hammond, but she did not describe any specific incidents. She thought that it happened 10 to 20

5

times. First she said that it happened only once at the trailer in Sumner, but she then said that she thought it happened one other time in Sumner.

¶ 12    Miller asked Stephanie if she ever told anyone about these incidents. Stephanie said that the first person she told was Jay Reeves, but she noted that she also told her new foster parents later that evening. Miller asked if she ever told her mother, to which Stephanie replied, "No." When Miller asked why, Stephanie told her that she did not tell her mother because she was afraid her mother would get angry at her. She added, "She usually gets mad."

¶ 13    At first, Stephanie said that her stepfather did not touch any part of her body other than her hand. She said this even when Miller asked her if he touched her anywhere else. Approximately 20 minutes into the interview, Miller asked Stephanie about what, if anything, the defendant said to her while making her rub his "private part." At this point, Stephanie told Miller, unprompted, that the defendant also put his hand inside her body. In response to questioning, she told Miller that these incidents only occurred when no one else was home.

¶ 14    At trial, Miller acknowledged that she asked Stephanie approximately seven times whether the defendant ever touched any other part of her body before Stephanie told her that he put his hand inside her vagina. Miller explained that it was common for children who have been abused to feel comfortable enough to tell some parts of their stories earlier than others. She testified that she believed that Stephanie had more to tell her based on her body language and her facial expressions.

¶ 15    Stephanie also testified at trial. She was nine years old at that time. She was first asked about the day she met Jay Reeves. She stated that she remembered him picking her up at school. Asked if she knew why Reeves picked her up, she replied, "Because the baby got hurt." Stephanie testified that at the time the baby was hurt, she lived in a trailer in Sumner with her

mother, her stepfather, the baby who was hurt, and Ashley, Colby, and Jacob. She testified that she could not remember the name of the baby. (We note that the baby was Jacob.)

¶ 16    Stephanie then testified in detail about the events of that morning. She testified that she was woken up by Jimmy touching her when it was still dark out. Jimmy was holding her hand on his penis and had his hand on her vagina, although she used the terms "private" or "private part." She testified that she asked Jimmy where the other adults were, and he told her that they were at the hospital. When she asked why, he told her that the baby was hurt.

¶ 17    Stephanie testified that it felt like two or three of the defendant's fingers were touching her and it felt like "his hand went a little bit in [her] bad spot like that." She explained that he was rubbing inside "the hole where [her] pee comes out." She testified that while this was happening, the defendant placed her hand on his "private part" and told her to "wiggle" it. She described the defendant's penis as feeling "like bones" with a "heartbeat." She also stated that it "felt like it was dripping down water." Stephanie testified that she asked the defendant if she could get up, but he told her, "In just a little bit." She testified, however, that he later stopped when she told him she needed to get up to use the bathroom.

¶ 18    Stephanie testified that the same thing happened other times in other places the family had lived, but she did not know how many times it had happened. She did not remember it happening any other times when they lived in the trailer in Sumner. She testified that it only happened when no one else was home. When asked if the abuse always followed the same pattern, Stephanie said, "No." She noted that it did not always happen when she was in bed. She described an incident that occurred while the family was living in a different trailer in Hammond, Indiana. On that occasion, she went into the bedroom shared by her mother and the defendant when the defendant asked her if she wanted to feed the turtles. After feeding the turtles, she sat

7

on the bed with the defendant, and they watched the turtles. She testified that the defendant then pulled her down on the bed and "started to do the private thing." Stephanie testified that they no longer had turtles when they lived in the trailer in Sumner; their only pet in Sumner was a dog.

¶ 19    Stephanie testified that Jay Reeves was the first person she told about the abuse. She explained that she never told her mother because she was afraid that her mother would be angry at her. She noted that her mother got angry at her often. Stephanie further testified that most of the time she liked her stepfather because he played games with her and was nice to her.

¶ 20    The State did not call the investigating officer to testify. The parties stipulated that Dr. Rachel Winters performed a sexual abuse examination of Stephanie, and that if called to testify, Dr. Winters would state that she found no physical evidence of abuse. The defendant called three witnesses, all of whom were individuals the family had lived with at some point during their many moves. All three witnesses testified that the defendant had a good relationship with Stephanie and that they never witnessed any incidents of abuse. The defendant testified on his own behalf. He, too, testified that he had a good relationship with Stephanie. He denied that he ever sexually abused his stepdaughter. He testified that on the morning in question, Joseph Sr. stayed home in the trailer while Tonya and Ashley took the baby to the hospital. He further testified that he was rarely alone with Stephanie in any of the places they lived, although he also testified that he was able to stay home and care for her when he was laid off from a job. According to the defendant, the family did not live in a trailer when they lived in Hammond. Instead, they lived in a house with his aunt and her fiancé. The defendant confirmed, however, that there were turtles in the bedroom he shared with Tonya at the house in Hammond.

¶ 21    During deliberations, the jury asked to view the video recording of the forensic interview again. The recording was sent to the jury with no objection. The jury returned a verdict of guilty,

8

and the court subsequently sentenced the defendant to 12 years in prison. The defendant filed a motion to reconsider his sentence and a motion for a judgment notwithstanding the verdict or a new trial. The court denied both motions. This appeal followed.

¶ 22    The defendant's first argument concerns jury instructions. In relevant part, the jury was instructed that "The information states that the offense charged was committed on or about January 30, 2014. If you find the offense charged was committed, the State is not required to prove that it was committed on the particular date charged." Defense counsel did not object to this instruction. She also did not request that the jury be instructed that it must find that the offense was committed within the State of Illinois. On appeal, the defendant argues that these instructions allowed jurors to find the defendant guilty based on the evidence of conduct that occurred in Indiana. He argues that, as such, the court erred in giving these instructions and that counsel was ineffective for failing to either object to the instruction concerning the timing of the offense or request an instruction on geographic jurisdiction. We disagree.

¶ 23    Jury instructions serve the important purpose of conveying to jurors " 'the legal rules applicable to the evidence presented at trial.' " *People v. Rogers*, 2012 IL App (1st) 102031, ¶ 61 (quoting *People v. Mohr*, 228 Ill. 2d 53, 65 (2008)). We will not reverse a trial court's decision on which instructions to give absent an abuse of the court's discretion. *People v. Gilliam*, 2013 IL App (1st) 113104, ¶ 41. On appeal, we must consider all of the instructions given and determine whether those instructions " 'fully and fairly announce the law applicable to the theories of the State and the defense.' " *Rogers*, 2012 IL App (1st) 102031, ¶ 61 (quoting *Mohr*, 228 Ill. 2d at 65). A court abuses its discretion if it gives instructions that do not accurately convey the applicable law or are not clear enough to avoid confusing or misleading jurors. *Id.* Significantly for purposes of this appeal, a court abuses its discretion if it gives instructions that,

9

due to their lack of clarity, relieve the State of its burden of proving any element of the charge beyond a reasonable doubt. *Id.* ¶ 63.

¶ 24    Criminal jurisdiction—*i.e.*, the fact that the offense charged took place wholly or partly within Illinois—is an essential element that must be proven beyond a reasonable doubt along with all of the elements of the specific offense charged. *Gilliam*, 2013 IL App (1st) 113104, ¶ 34. Thus, if the location of the criminal conduct at issue is unclear, it is necessary for the trial court to instruct jurors that they must find that the crime was committed at least partly within the state. See *People v. Ogunsola*, 87 Ill. 2d 216, 222 (1981) (holding that fundamental fairness requires that a jury be instructed on all of the elements it must find beyond a reasonable doubt); *People v. Sims*, 244 Ill. App. 3d 966, 1006 (1993) (noting that the jury was instructed that it must find that the offense took place in Madison County, Illinois, in an appeal challenging the sufficiency of the evidence to support that finding). However, where the location is *not* unclear, the trial court has no obligation "to *sua sponte* issue an instruction on the issue of geographic jurisdiction." *Gilliam*, 2013 IL App (1st) 113104, ¶ 39.

¶ 25    Here, as noted, counsel did not request an instruction on the question of geographic jurisdiction. The defendant argues that her failure to do so constituted ineffective assistance of counsel. This is so, he contends, because the jury heard evidence that similar conduct occurred in both states, thereby making it possible for jurors to find him guilty even if they were only convinced beyond a reasonable doubt that the conduct in Indiana occurred. He argues that the problem was magnified by counsel's failure to object to an instruction telling jurors that they could find the defendant guilty if they found that the charged conduct did not occur on the date specified in the charge. He points out that there was no evidence of abuse occurring in Illinois on any other date. We are not persuaded.

10

¶ 26    Claims of ineffective assistance of counsel are evaluated under the test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was deficient and that the defendant was prejudiced as a result. *People v. Makiel*, 358 Ill. App. 3d 102, 105-06 (2005). To demonstrate deficient performance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 105. To demonstrate prejudice, he must show there is reasonable probability that he would have been acquitted if not for the deficiencies in counsel's performance. *Id.* at 105-06 (citing *Strickland*, 466 U.S. at 694). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *People v. Manning*, 241 Ill. 2d 319, 327-28 (2011). For the reasons that follow, we do not believe the defendant can make either of these showings in this case.

¶ 27    We find the First District's decision in *Gilliam* instructive. There, the defendant was convicted on four charges involving sexual abuse of his two stepdaughters. *Gilliam*, 2013 IL App (1st) 113104, ¶ 1. As in this case, the defendant and his wife and stepdaughters lived in multiple locations in Illinois and Indiana, and there was evidence that abuse occurred in both states. *Id.* ¶¶ 5-26. The defendant appealed his convictions, arguing that the trial court's failure to instruct jurors that the State was required to prove that the alleged abuse took place in Illinois constituted plain error. *Id.* ¶ 31.

¶ 28    On appeal, the First District first found that the State presented sufficient evidence to prove beyond a reasonable doubt that the offenses charged took place in Illinois. *Id.* ¶¶ 35-37. The court then directly addressed the defendant's contention that because the jury was not instructed on the element of geographic jurisdiction, it could have found the defendant guilty of some of the charges based solely on conduct that occurred in Indiana. *Id.* ¶ 38. In rejecting this

11

claim, the court emphasized that the charges were based on two specific incidents, one involving foot-to-vagina contact between the defendant and both of his stepdaughters, the other involving penis-to-vagina contact between the defendant and both girls. *Id.* ¶ 39. The court explained that because both girls testified that these two specific incidents took place when they lived in apartments in Chicago, "[t]he location element was not unclear." *Id.* As such, the court concluded, "the trial court was not bound to *sua sponte* issue an instruction on the issue of geographic jurisdiction." *Id.* The appellate court went on to hold that the trial court did not err in declining to instruct the jury on geographic jurisdiction. It therefore found it unnecessary to consider whether the claimed error rose to the level of plain error. *Id.* ¶ 44.

¶ 29    The defendant argues that *Gilliam* was wrongly decided because sufficiency of the evidence is the wrong standard. He correctly notes that if the evidence is not sufficient to prove Illinois jurisdiction beyond a reasonable doubt, the jury instruction issue becomes irrelevant because the proper remedy is outright reversal. See *People v. Moreland*, 292 Ill. App. 3d 616, 619 (1997). He argues that even in cases where the evidence is sufficient to prove jurisdiction beyond a reasonable doubt, the jury must be instructed on the issue if the evidence raises a question about the location of the conduct at issue.

¶ 30    We note that although the *Gilliam* court did focus most of its discussion on the sufficiency of the evidence, as the defendant points out (see *Gilliam*, 2013 IL App (1st) 113104, ¶¶ 35-37, 43), the court also found that the element of location was not in question (see *id.* ¶ 39). In addition, as the defendant himself acknowledges, the *Gilliam* court implicitly recognized that if the location of the conduct *is* in question, an instruction on geographic jurisdiction is needed. See *id.* ¶ 39 (holding that a court is not required to provide an instruction on geographic jurisdiction *if* the location of the criminal conduct at issue is clear). We therefore do not read

12

*Gilliam* as holding that an instruction on geographic jurisdiction is *never* required as long as there is sufficient evidence to prove beyond a reasonable doubt that the offense was committed at least partly in Illinois. We agree with the defendant that the question is whether, under the facts and circumstances of the case, an instruction on geographic jurisdiction is necessary to avoid the possibility of a conviction based on conduct that did not occur within the state. We turn now to that question.

¶ 31     Here, as in *Gilliam*, the charge was based on a specific incident. It specifically alleged that the defendant digitally penetrated Stephanie's vagina and forced her to touch his penis on or about January 30, 2014. As discussed previously, the evidence of abuse at trial consisted of Stephanie's statement to Jay Reeves, her video-recorded forensic interview with Teresa Miller, and her testimony at trial. In both her statement to Reeves and her interview with Miller, Stephanie gave detailed accounts of the specific incident described in the charge—an incident that occurred in Illinois. She told Reeves about the incident the day it happened, and she told Miller about the incident the following day. There was no reason for jurors to believe that Stephanie was confused about where this incident took place when she described it to Reeves and Miller.

¶ 32     At trial, Stephanie likewise described the incident that occurred in Illinois in detail. Although the trial took place 10 months after the incident, the incident occurred on a day that likely stood out in her memory because it was the day her baby cousin suffered life-threatening injuries. In questioning Stephanie, both defense counsel and the State's attorney specifically called her attention to the day the baby was injured. In addition, as the State points out, Stephanie knew the difference between the places she lived (even though she described the Hammond residence as a trailer, rather than a house)—she testified that in Hammond, the family had pet

13

turtles, while in Sumner, their only pet was a dog. Thus, there was no reason for jurors to find that the incident Stephanie described in her testimony took place anywhere other than Sumner, Illinois.

¶ 33    Although there was some evidence of other conduct, under the circumstances of this case, there was no reason for jurors to have believed that any other conduct was at issue. Stephanie told both Reeves and Miller that similar incidents also took place in Indiana, but she did not discuss any particular incident with either of them. At trial, however, Stephanie did describe an additional incident that took place in Indiana. She gave specific details about the circumstances leading up to the abuse that took place that day, but all she said about the abuse itself was that the defendant "did the private thing." Thus, the evidence at trial was clearly focused on the Illinois incident. It is also worth noting that both attorneys told jurors during their opening statements that the events of January 30, 2014, were the events at issue in the case. In light of this, we believe it was clear to jurors that the events at issue were the events that took place that morning in Sumner, Illinois. An instruction telling them so was not necessary.

¶ 34    We must also consider the potential impact of the instruction telling jurors that the offense was committed "on or about January 30, 2014," but that the State was not required to prove that the offense took place on that date. As we have discussed, the defendant argues that this instruction could have led jurors to believe that they could find the defendant guilty if they believed Stephanie's account of the incident that took place in Hammond, Indiana, even if they did not believe her account of the incident in Sumner, Illinois.

¶ 35    The State, by contrast, argues that the instruction was proper and that the "on or about" language actually helped clarify for jurors that the events at issue were those that took place in the trailer in Sumner. As the State points out, the incident took place overnight. Stephanie

14

testified that she did not know what time it was when the defendant woke her up, and the defendant testified that he did not know what time it was when Ashley and Tonya left to take baby Jacob to the hospital. Thus, the State contends, the instruction was necessary and proper because without it, jurors could have found that the State failed to prove beyond a reasonable doubt that the offense occurred after midnight—on January 30—rather than before midnight—on January 29. See *People v. Whitaker*, 263 Ill. App. 3d 92, 100 (1994). The State further contends that reasonable jurors, applying common sense, could conclude that conduct occurring before midnight on January 29 was included in a charge alleging that a crime was committed "on or about January 30," but that common sense would preclude them from finding that conduct occurring at least several weeks earlier, when the family lived in Indiana, was likewise included. As such, the State contends, the phrase "on *or about*" provided additional clarity for jurors about which conduct was at issue.

¶ 36    We need not decide whether we would accept the State's assertion about the benefit of the "on or about" language if the location of the conduct at issue were not otherwise sufficiently clear. For the reasons we have already discussed, we believe the location of the conduct at issue in this case was not in doubt. Thus, we do not believe jurors were misled by the instruction. Moreover, we find that the instructions as a whole did not allow the jury to return a guilty verdict based on conduct that occurred in Indiana. We therefore conclude that counsel provided effective assistance.

¶ 37    The defendant's next argument concerns the court's handling of the *Zehr* principles during *voir dire*. Illinois Supreme Court Rule 431(b) requires courts to question prospective jurors as to their understanding and acceptance of four principles of law known as the *Zehr* principles. The four principles are as follows: (1) the defendant is presumed to be innocent of the

15

charge against him; (2) the defendant is not required to offer any evidence on his behalf; (3) the State must prove the defendant guilty beyond a reasonable doubt; and (4) jurors may not draw any negative inferences if the defendant chooses not to testify. *People v. Thompson*, 238 Ill. 2d 598, 606 (2010) (quoting Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); see also *Zehr*, 103 Ill. 2d at 477. Prospective jurors may be questioned individually or in a group. However, every juror must have the opportunity to respond to questions about whether they both understand and accept each of these four principles. *Thompson*, 238 Ill. 2d at 607.

¶ 38    The defendant contends that in this case, the court ran afoul of these requirements in two ways. First, he argues that the court erred by commingling the *Zehr* principles rather than clearly addressing each principle separately. Second, he contends that the court's method of questioning jurors did not allow all of the jurors to tell the court whether they understood and accepted the principles. He points out that although some prospective jurors were specifically asked whether they understood and accepted the principles, others were simply called on by name.

¶ 39    The defendant acknowledges that he forfeited review of this issue by failing to object during *voir dire*. See *People v. Belknap*, 2014 IL 117094, ¶ 47. He asks us to review his claim under the plain error doctrine. Under that doctrine, we may consider arguments that have been forfeited if (1) "the evidence [was] so closely balanced that the error alone threatened to tip the scales of justice against the defendant" or (2) the error was serious enough to affect the fairness of the defendant's trial and undermine "the integrity of the judicial process." *People v. Piatkowski,* 225 Ill. 2d 551, 565 (2007). Our supreme court has held that errors in questioning jurors about the *Zehr* principles are cognizable only under the closely-balanced prong of plain error analysis. *People v. Sebby*, 2017 IL 119445, ¶ 52; *Thompson*, 238 Ill. 2d at 615. The court explained that although the questioning required by *Zehr* and Rule 431(b) was designed "to help

16

ensure a fair and impartial jury" (*Thompson*, 238 Ill. 2d at 609), a court's failure to fully comply "does not automatically result in a biased jury" (*id.* at 610). Thus, failure to comply with Rule 431(b) does not automatically "render a trial fundamentally unfair." *Id.* at 611.

¶ 40 The defendant contends that plain error review is appropriate in this case because the evidence was closely balanced. Before considering this question, however, we must first consider whether there was any error at all. *People v. Ware*, 407 Ill. App. 3d 315, 354 (2011). The State concedes that the court erred in commingling some of the *Zehr* principles, but the State argues that the evidence was not closely balanced. We agree that the court erred. However, because we find that the evidence was not so closely balanced that the error threatened to tip the scales against the defendant, we decline to excuse the defendant's forfeiture under the plain error doctrine.

¶ 41 Prospective jurors were questioned in three panels. The court began its discussion of the *Zehr* principles with the first panel by telling them that the defendant was presumed to be innocent of the charge against him. The court asked the first prospective juror if she understood that principle and then asked if she could follow that rule. The court questioned the second prospective juror in the same manner. The court called the next four jurors by name, stating to each of them, "Same question." The court then repeated the proposition that the defendant is presumed to be innocent and asked the next juror if he understood that principle and if he could follow it. The remaining jurors on the panel were simply called upon by name.

¶ 42 The defendant acknowledges that the court correctly articulated the first *Zehr* principle to this panel, but he argues that the court's method of questioning did not give most of the jurors an opportunity to tell the court whether they understood and accepted the principle. We do not agree that the court was required to repeat the full question to each juror. There are no particular words

17

or phrases that must be used to comply with the requirements of *Zehr* and Rule 431(b). *Ware*, 407 Ill. App. 3d at 356. What is important is that the court must give all of the jurors the opportunity to tell the court whether they understand and accept each principle. *Thompson*, 238 Ill. 2d at 607. The questioning we have just described gave jurors on the first panel that opportunity because it was clear that the court was asking them to answer the same question it asked the first two jurors—that is, whether they both understood and accepted the first principle. However, as we will explain, we find that not all of the jurors were given an opportunity to tell the court whether they both understood and accepted all four principles for different reasons.

¶ 43    After discussing the first *Zehr* principle with the first panel, the court turned its attention to the remaining principles. The court asked the first juror on the panel, "Do you understand and accept that the defendant is presumed innocent and does not have to offer any evidence in his own behalf, but must be proven guilty beyond a reasonable doubt?" The court then asked if she could follow that rule. The court questioned most of the remaining jurors on the panel simply by calling on them by name.

¶ 44    As both parties point out, the court's second question commingled the first, second, and third *Zehr* principles. The court discussed these three principles with the second and third panels in a similar manner. Although the State concedes this was error, we note that commingling of the *Zehr* principles is not a *per se* violation of Rule 431. See, *e.g.*, *Ware*, 407 Ill. App. 3d at 356; *People v. Davis*, 405 Ill. App. 3d 585, 590 (2010). However, the court must give jurors an opportunity to state whether they understand and accept each principle; the court may not merely make " 'a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law.' " *Thompson*, 238 Ill. 2d at 607 (quoting Ill. S. Ct. R. 431, Committee Comments). The appellate courts in both *Ware* and *Davis* found that trial courts

18

complied with this requirement even though they commingled some of the *Zehr* principles. *Ware*, 407 Ill. App. 3d at 355-56; *Davis*, 405 Ill. App. 3d at 590. In *Ware*, the trial court "paused every few sentences" while explaining the principles and questioned jurors, thereby allowing jurors "to focus on each principle explained" while responding to questioning. *Ware*, 407 Ill. App. 3d at 356. Similarly, the trial court in *Davis* combined its explanation of two of the *Zehr* principles, telling jurors that a defendant is not required to testify and is not required to call witnesses or present any evidence to prove his innocence. *Davis*, 405 Ill. App. 3d at 589. However, the trial court asked jurors two distinct questions addressing each of the two principles individually, which the appellate court found sufficient. *Id.* at 589-90.

¶ 45     In this case, by contrast, the court did not ask jurors questions that addressed all three commingled principles individually. The court did, however, provide separate explanations of two of those principles, followed by questioning. As we have discussed, the court previously addressed the first *Zehr* principle—the presumption of innocence—on its own. The court also went on to discuss the third *Zehr* principle alone. Addressing the entire panel, the court asked as follows:

> "If, at the close of all the evidence and after you have heard the arguments of counsel, you believe that the State has failed to prove [the] defendant guilty beyond a reasonable doubt, would you, under those circumstances, return a verdict of not guilty?"

The court called on the first juror by name. After she replied, "Yes," the court repeated the question and called on the remaining jurors by name only. Although the court's question might be construed as asking whether jurors *accepted* the principle, the court did not ask if jurors *understood* the principle. See *People v. Mueller*, 2015 IL App (5th) 130013, ¶ 23. In addition, because the court never separately addressed the principle that a defendant need not present

19

evidence in his own defense, none of the jurors were questioned as to their understanding and acceptance of that principle.

¶ 46    The court then addressed the fourth *Zehr* principle, explaining to the panel that the defendant was not required to testify and that the jury may not hold it against him if he chose not to do so. The court asked the first juror if she understood that principle and whether she could apply the principle if chosen to serve on the jury. The court called on the remaining jurors by name only. One of the last jurors to be called indicated that he was not sure. The court asked the next juror if he could "follow that" and then called on the final juror on the panel by name only. Although most of the jurors on the first panel were given an opportunity to tell the court whether they both understood and accepted this principle, the last two jurors were only asked if they could "follow" the principle; they were not asked if they understood it.

¶ 47    The court's questioning of the second and third panels followed a similar pattern. There were a few differences worth noting, however. For example, after explaining to the second panel that a defendant is presumed innocent of the charges against him (the first *Zehr* principle), the court asked the first juror whether he understood and accepted this principle and whether he thought he could abide by it if chosen to serve on the jury. The court then addressed the next several jurors, either by stating "Same question" or simply by calling their names. The court asked one of the jurors, "Do you understand the question?" The court did not ask the juror whether he accepted the principle, however. The court called on the remaining jurors by name. Those jurors may reasonably have understood that they, too, were being asked only whether they understood that the defendant was presumed innocent and not whether they also accepted this principle.

¶ 48    In addressing the second panel, the court once again commingled the first, second, and third principles. The court once again went on to ask the prospective jurors whether they would return a verdict of not guilty if they did not believe the State had proven the defendant guilty beyond a reasonable doubt (the third *Zehr* principle). This time, the court also asked the first juror if he understood the question. However, the court repeated the original question to the next two jurors without also asking if they understood the question. The court went on to ask the remaining jurors to respond, either by saying "Same question" or by calling upon them by name. Thus, only the first panel member was clearly asked whether he understood that the defendant had to be proven guilty beyond a reasonable doubt.

¶ 49    In discussing the fourth *Zehr* principle with the second panel, the court asked the first juror, "If the defendant, James Choate, does not testify in his own behalf, would you hold that against him?" The court called on the remaining jurors by name. Thus, the court did not ask any of the jurors whether they understood this principle.

¶ 50    The court's first question to the third panel commingled the first and third *Zehr* principles. The court asked the first juror if he understood and accepted that the defendant is "presumed innocent unless the charge is proven against him beyond a reasonable doubt" and then called on the remaining jurors by name. Jurors on this panel were never asked questions focused solely on the understanding and acceptance of the presumption of innocence. The court once again commingled the first, second, and third principles, explaining them to the third panel much the way it explained them to the first two panels. As it did with the first two panels, the court asked the third panel, as a group, if they would return a verdict of not guilty if they found that the State had not proven the defendant's guilt beyond a reasonable doubt. The court asked the first juror if he understood the question or had "any questions about that" and then called on

21

the remaining jurors by name. The court asked if jurors on the third panel would hold it against the defendant if he did not testify (the fourth *Zehr* principle) but did not ask jurors whether they understood the principle.

¶ 51    Because not all jurors were clearly asked whether they both understood and accepted each of the *Zehr* principles, we agree that error occurred. The question, then, is whether we may consider this error under the plain error doctrine. As we noted earlier, the defendant contends that plain error review is appropriate because the evidence in this case is closely balanced. We do not agree.

¶ 52    A defendant seeking plain error review on the basis of closely balanced evidence has the burden of persuading this court that the evidence is closely balanced enough to warrant such review. *Thompson*, 238 Ill. 2d at 613; *Piatkowski*, 225 Ill. 2d at 567. This is a different question from whether the evidence is sufficient to support a conviction beyond a reasonable doubt. *Piatkowski*, 225 Ill. 2d at 566. The question is whether the evidence is so closely balanced that "the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51.

¶ 53    Answering that question requires us to engage in a commonsense evaluation of the evidence. *Id.* ¶ 53; Belknap, 2014 IL 117094, ¶ 50. We must consider the totality of the evidence in the case. *Sebby*, 2017 IL 119445, ¶ 53. In evaluating the strength of that evidence, we must consider both "the quantum and quality" of the evidence. See *Piatkowski*, 225 Ill. 2d at 571. Applying these principles to the case at hand, we are not convinced that the evidence in this case was so closely balanced that the court's error threatened to tip the balance against the defendant.

¶ 54    The defendant argues that the evidence was closely balanced because the case came down to a contest of credibility between the defendant and Stephanie. He argues that Stephanie's account should not be given more weight than his simply because it was repeated through the

22

testimony of Jay Reeves and the recording of the forensic interview with Teresa Miller. See *People v. Boling*, 2014 IL App (4th) 120634, ¶ 131. We are not persuaded.

¶ 55    Certain types of out-of-court statements by child witnesses in sexual abuse cases, such as the statements Stephanie made to Reeves and Miller in this case, are admissible at trial precisely because they constitute "reliable, corroborating evidence." See *People v. Bowen*, 183 Ill. 2d 103, 114 (1998) (citing 725 ILCS 5/115-10 (West 1994)). Stephanie's statement to Reeves was an unprompted spontaneous outcry. Courts have found such statements to be particularly reliable, especially when they are consistent with other statements made by the child. See *People v. Garcia*, 2012 IL App (1st) 103590, ¶¶ 97-98. Courts likewise have recognized the reliability of recorded statements made shortly after the original outcry, such as Stephanie's interview with Miller. See *Bowen*, 183 Ill. 2d at 115-16.

¶ 56    Here, Stephanie's statements to Reeves and Miller were consistent with each other and with Stephanie's later trial testimony. Stephanie used age-appropriate language in describing the defendant's behavior, which is another indicator of reliability. See *Garcia*, 2012 IL App (1st) 103590, ¶¶ 97, 99. Stephanie's statement to Reeves was completely unprompted; it was Stephanie, not Reeves, who initiated the discussion. Contrary to the defendant's contention, Stephanie's statement to Miller alleging that the defendant put his fingers inside her vagina was also unprompted. Although Miller asked Stephanie earlier in the interview whether the defendant had touched parts of her body other than her hand, Miller never asked about penetration. Moreover, when Stephanie volunteered that information, it was not in response to a question about inappropriate touching; it was in response to a question about what the defendant said to her while he was making her touch his penis. The spontaneity of these statements is another indicator of reliability. See *id.* ¶ 99.

23

¶ 57    One further indication of the reliability of Stephanie's statements is that she had no motive to lie. See *id.* ¶ 97. The defendant argues that Stephanie had a motive to make up a story about him so that she could be sent to live with her father instead of her mother. That way, she would no longer have to move around so much, something she testified she did not like doing. We do not find it plausible to believe that an eight-year-old child could think through the multiple layers of cause-and-effect necessary to contrive such a plan, however. Moreover, the evidence showed that Stephanie liked having the defendant in her life; she just wanted the incidents of sexual abuse to stop.

¶ 58    It is also worth noting that both statements were admitted into evidence only after the trial court held a hearing to determine whether they had sufficient indicia of reliability. See 725 ILCS 5/115-10(b)(1) (West 2012). We find that Stephanie's statements constituted strong corroborating evidence for her testimony.

¶ 59    In addition, when asked at trial to describe what the defendant's penis felt like, Stephanie used very child-like language to accurately describe an erection, masturbation, and ejaculations, things she clearly would have had no understanding of. This lent additional credence to her testimony.

¶ 60    This does not end our inquiry, and we emphasize that our holding should not be read to suggest that the evidence may *never* be closely balanced in cases where a child's allegations of abuse are corroborated by out-of-court statements that have been found to be reliable. As noted earlier, we must consider both the quantum and quality of the evidence as a whole in making that determination. See *Sebby*, 2017 IL 119445, ¶ 53; *Piatkowski*, 225 Ill. 2d at 571. Here, most of the defendant's evidence did not contradict Stephanie's statements. The defendant and his witnesses confirmed that the family moved many times and that Stephanie had a good

24

relationship with the defendant. Although the defense witnesses all stated that they never witnessed abuse, Stephanie stated that the abuse only occurred when no one else was present, something which makes sense in light of the nature of her allegations. The only evidence that directly contradicted Stephanie's account was the defendant's own assertion that he did not molest her. While most of the defendant's testimony was not inherently implausible or internally inconsistent (see *Boling*, 2014 IL App (4th) 120634, ¶ 131), his claim that he was rarely alone with his stepdaughter was not particularly credible in light of his contrary testimony that he was able to be home to care for her when he was laid off from work.

¶ 61    Finally, we reiterate that the question before us is not merely whether the evidence was close, but whether it was so closely balanced that "the error alone severely threatened to tip the scales of justice" against the defendant. *Sebby*, 2017 IL 119445, ¶ 51. Put another way, the question is whether " 'the jury's guilty verdict may have resulted from the error and not the evidence.' " *Boling*, 2014 IL App (4th) 120634, ¶ 130 (quoting *People v. Herron*, 215 Ill. 2d 167, 178 (2005)). In light of the strength of the State's evidence and the weakness in the one piece of evidence that contradicts it, we cannot find that the evidence in this case is so closely balanced that the court's error during *voir dire* could have tipped the balance against the defendant or led to the guilty verdict in this case. We also note that the potential impact of the court's error was minimized by the fact that the defendant did present evidence and testify on his own behalf. We therefore decline to consider his claim under the plain error doctrine.

¶ 62    For the foregoing reasons, we affirm the defendant's conviction.


¶ 63    Affirmed.

2018 IL App (5th) 150087

NO. 5-15-0087

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Lawrence County. |
| | ) | |
| v. | ) | No. 14-CF-20 |
| | ) | |
| JAMES E. CHOATE III, | ) | Honorable |
| | ) | Robert M. Hopkins, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Rule 23 Order Filed:**     September 19, 2018
**Motion to Publish Granted:**     October 2, 2018
**Opinion Filed:**     October 2, 2018

_____

**Justices:**     Honorable Melissa A. Chapman, J.

Honorable Judy L. Cates, J., and
Honorable James R. Moore, J.,
Concur

_____

**Attorneys**
**for**
**Appellant**

Michael J. Pelletier, State Appellate Defender, Ellen J. Curry, Deputy
Defender, Eun Sun Nam, Assistant Appellate Defender, Office of the
State Appellate Defender, Fifth Judicial District, 909 Water Tower Circle,
Mt. Vernon, IL 62864

_____

**Attorneys**
**for**
**Appellee**

Hon. Michael M. Strange, State's Attorney, Lawrence County Courthouse,
Lawrenceville, IL 62439; Patrick Delfino, Director, David J. Robinson,
Acting Deputy Director, Sharon Shanahan, Staff Attorney, Office of the
State's Attorneys Appellate Prosecutor, Fifth District Office, 730 E.
Illinois Highway 15, Suite 2, Mt. Vernon, IL 62864

_____